The plaintiffs in this medical malpractice action, James Phelps and his wife Cynthia Phelps, appeal from a judgment based in part on a directed verdict and in part on a jury verdict entered in favor of the defendant physician, Dr. Thomas Dempsey, an orthopedic surgeon. The Phelpses brought the action as next friends and parents of James Phelps, Jr., a minor who underwent amputation of a significant portion of his right foot because of complications following surgery to correct a clubfoot condition. James, Jr., was born with spina bifida. It was eventually *Page 378 
also determined that his right foot was a clubfoot. The foot condition worsened as the child grew older, and it required corrective surgery when he was two years old.
Dr. Dempsey performed the foot surgery on June 30, 1987, and James, Jr., was released from the hospital the following day. The child's right foot was enclosed in a cast that extended the full length of his leg. On July 2, the Phelpses noted that the toes of the child's right foot had turned a dark red; the toes continued to darken in color until on Saturday, July 4, the Phelpses noted that the big toe on that foot had a dark purple color and that the second and third toes were lighter purple. They also noted that the child had a slight fever. The Phelpses attempted to contact Dr. Dempsey that day through his answering service, but were unable to. The child's condition worsened and on July 5 they again attempted to contact Dr. Dempsey through his answering service; they were instructed to bring the child to Dr. Dempsey's office the next morning.
On July 6, the child's condition had worsened, his big toe was nearly black, and the second and third toes were dark purple. Dr. Dempsey cut a small hole in the cast to observe the condition of the foot and concluded that the child had "cast blisters" on the foot. The child's condition worsened the next day, July 7; his fever persisted, his toes were darker, and pus was draining from his foot. Although Mrs. Phelps returned the child to Dr. Dempsey, the doctor simply informed her that the cast blisters had broken and were draining. Mrs. Phelps returned James, Jr., to Dr. Dempsey on July 8. He instructed her to take the child to his pediatrician to be evaluated for an ear or respiratory infection.
On July 9, Mrs. Phelps took James, Jr., to Dr. Van Chunn, his pediatrician. Dr. Chunn noted the child's fever and the blackened color of all his toes; he prescribed an antibiotic, even though he found no ear or respiratory infection. He also sent James, Jr., for an X-ray of his right foot. Mrs. Phelps returned James, Jr., to Dr. Chunn on July 10. Dr. Chunn advised her that the child's condition had to be caused by something occurring beneath the cast, but that the X-ray did not show the foot well enough to indicate the cause, and instructed her to return the child to Dr. Dempsey.
On the morning of July 11, the condition of the child's foot had worsened and the big toe was completely black. Mrs. Phelps telephoned Dr. Dempsey and informed him that she and her husband were taking James, Jr., to the emergency room at Springhill Memorial Hospital. Dr. Dempsey met the Phelpses at the hospital and, at the insistence of Mr. Phelps, removed the cast from the child's foot and leg. Dr. Dempsey had informed them that removing the cast could upset the surgical procedure that had been performed to correct the child's clubfoot condition. Removal of the cast revealed that the foot was swollen and blackened and was draining pus. Dr. Dempsey bandaged the foot and told the Phelpses to bring James, Jr., to his office the next morning.
On the morning of July 12, Dr. Dempsey cleaned and rebandaged the child's foot and gave them an antibiotic used to treat skin infections. He told the Phelpses that James, Jr., had some dead skin and instructed them to clean and bandage his foot several times daily. During the following week, the child's fever decreased, but the condition of his foot did not improve.
On July 17, the child's fever returned and, on July 18, his parents took him to the Mobile Infirmary emergency room, where they were met by Dr. Chunn. Dr. Chunn admitted James, Jr., and put him on an intravenous antibiotic. He also ordered a test of a culture from the surgical wound on the child's foot; that test was positive for staphylococcus bacteria. Over the next several days, the child's condition improved somewhat and, on July 24, Dr. Dempsey discharged him from the hospital and placed him on the same antibiotic he had prescribed earlier.
On August 1, Mrs. Phelps discovered a great deal of "black stuff" while changing the bandages on the child's foot. She took him to Dr. Dempsey, who informed her that the child needed to see a plastic surgeon. James, Jr., was admitted to the Mobile Infirmary on August 3, and the dead tissue on his *Page 379 
right foot, including the big toe, was amputated.
On December 12, 1989, the Phelpses sued Dr. Dempsey, alleging that he had acted negligently in his post-operative care of James, Jr. On September 3, 1993, they amended the complaint to add 1) a claim alleging that Dr. Dempsey had operated on James, Jr., without obtaining their informed consent, and 2) a claim alleging that Dr. Dempsey had acted with "conscious or reckless disregard" in treating James, Jr., following the surgery and seeking punitive damages. With regard to the informed consent claim, the Phelpses alleged that Dr. Dempsey had failed to inform them that children with spina bifida have an increased risk of infection following surgery.
In his defense, Dr. Dempsey contended that before performing the foot surgery he had fully informed the Phelpses about the surgery, and that his information met the applicable standard of care regarding informed consent, and that the Phelpses had given informed consent to the surgery. He also asserted as a defense to the malpractice claim the theory that a person with a clubfoot suffers from vascular insufficiency in that foot, because that person is born without one of the two major arteries that supply blood to the foot; thus, Dr. Dempsey's defense was that the healing of the surgical wound placed too great a demand on the blood being supplied by the one artery in the child's foot and that the portion of that foot where the artery was missing was deprived of blood and that the lack of blood caused the death of tissue in that area. Thus, Dr. Dempsey argued that James, Jr., was born with a vascular abnormality and that the loss of a portion of his foot following clubfoot surgery was inevitable, regardless of the level of post-operative care he received.
On January 14, 1993, Dr. Dempsey identified Dr. David Hootnick as a medical expert who would testify at trial that James, Jr., suffered from a vascular abnormality in his right foot and that that abnormality caused the death of tissue following surgery. The Phelpses took Dr. Hootnick's deposition on October 13, 1993, approximately seven weeks before the trial. Dr. Hootnick explained his theory regarding the abnormal vasculature of the child's clubfoot and also noted a safe, new, noninvasive diagnostic method for determining the blood supply to a patient's legs and feet, known as a "color Doppler" test.
On October 15, 1993, Dr. Dempsey served the Phelpses with interrogatories and requests for production of documents relating to any medical evidence and asking them to identify those experts who would testify on the issue of blood flow in the child's right foot. He also moved the court to shorten the time for the Phelpses to answer; the court granted his motion, shortening their time to October 29, 1993. The Phelpses' response to the interrogatories noted only their son's medical records, which had already been produced, and the testimony of Dr. Dean MacEwen, who the Phelpses had previously indicated would testify that Dr. Dempsey's post-operative care had not met the applicable standard of care; their response indicated no additional evidence and named no other experts.
Color Doppler testing of the child's lower right limb, which had undergone the clubfoot surgery and subsequent partial amputation, and similar testing of his lower left limb were performed at the University of South Alabama Medical Center on November 30 and December 1, 1993. The tests results stated: "Doppler spectra of right lower limb arteries are normal, with normal color flow Doppler signals. Arterial waveform of right lower limb arteries are unremarkable. CONCLUSION: NO EVIDENCE OF ARTERIAL INSUFFICIENCY IN THE LOWER LIMBS." The results of the tests were provided to Dr. Dempsey's counsel on December 3, 1993, in an amended answer to interrogatories and request for production of documents. The amended answer also listed four additional experts that the Phelpses might call at trial.
Dr. Dempsey's counsel responded by filing a motion in limine that same day, asking the trial court to strike the Phelpses' amended answer to interrogatories and to preclude the Phelpses from using the color Doppler tests at trial and to preclude them from calling any of their four new experts. Dr. Dempsey argued that the Phelpses' amended answer to *Page 380 
interrogatories violated the trial court's December 12, 1989, pre-trial order controlling discovery, in that the amended answer was filed only three days before the December 6, 1993, trial date.
On December 3, 1993, the trial court heard arguments on the motion in limine. The Phelpses argued that the color Doppler testing was evidence rebutting the expected expert testimony by Dr. Hootnick and that, by its own terms, the court's discovery order did not apply to such rebuttal evidence. However, the trial court granted Dr. Dempsey's motion in limine and ruled that the Phelpses could not introduce evidence of, or mention in any way during the trial, the color Doppler testing of the child's lower extremities.
At trial, the Phelpses presented expert testimony by Dr. MacEwen that Dr. Dempsey's post-operative care of James, Jr., fell below the medical standard of care; specifically, Dr. MacEwen testified that Dr. Dempsey failed to properly treat the staphylococcus infection in the surgical wound, that his failure to treat it caused the foot to swell within the cast, and that the swelling cut off the blood flow to a portion of the child's foot and eventually caused the death of that tissue. In response, Dr. Dempsey presented the expert testimony of Dr. Hootnick, who testified that he believed James, Jr., suffered from a vascular abnormality in his clubfoot and that that abnormality caused the death of certain tissue in the foot during the healing of the surgical wound. At the close of the evidence, the trial judge granted Dr. Dempsey's motion for a directed verdict on the Phelpses' claim that Dr. Dempsey had performed the surgery without informed consent. Thereafter, the jury returned a verdict in favor of Dr. Dempsey on the Phelpses' claim that Dr. Dempsey's post-operative care fell below the applicable medical standard of care. On January 7, 1994, the Phelpses moved for a new trial, arguing that the court had erred in granting Dr. Dempsey's motion in limine relating to the color Doppler tests. The court denied that motion on February 22, 1994.
The Phelpses appeal, contending that the trial court erred in directing a verdict for Dr. Dempsey on their informed-consent claim and erred in denying their motion for a new trial on their claim alleging post-operative malpractice.
 I.
We first address the informed-consent claim. Because the Phelpses' action was filed after June 11, 1987, the "substantial evidence rule" applies. Ala. Code 1975, § 12-21-12. Under that rule, "[i]n reviewing a trial court's ruling on a motion for a directed verdict, the appellate court must determine whether the party having the burden of proof has produced substantial evidence creating a question requiring resolution by the jury." Bell v. Sugarwood Homes, Inc.,619 So.2d 1298, 1300 (Ala. 1993). However, in reviewing the record to determine whether the Phelpses presented substantial evidence in support of their claim that Dr. Dempsey failed to obtain their informed consent before performing the surgery on James, Jr., this Court "must view all the evidence in a light most favorable to the [Phelpses] and must entertain such reasonable evidentiary inferences as the jury would be free to draw." Renfro v. Georgia Power Co., 604 So.2d 408, 411 (Ala. 1992).
The elements of a cause of action against a physician for failure to obtain informed consent are: (1) the physician's failure to inform the plaintiff of all material risks associated with the procedure, and (2) a showing that a reasonably prudent patient, with all the characteristics of the plaintiff and in the position of the plaintiff, would have declined the procedure had the patient been properly informed by the physician. Fain v. Smith, 479 So.2d 1150 (Ala. 1985);Fore v. Brown, 544 So.2d 955 (Ala. 1989). The Phelpses presented expert testimony by Dr. MacEwen that the increased risk of post-operative wound infection common to children with spina bifida was a material risk known at the time of their son's surgery. However, the Phelpses presented no evidence that at the time of the surgery it was generally known in the medical community that there was a material risk of loss of tissue following clubfoot surgery and that that loss would require amputation. *Page 381 
Although the objective standard adopted in Fain neither requires the plaintiff in an informed consent action to testify that he would not have undergone the procedure if he had been properly informed nor prohibits the plaintiff from so testifying, such testimony from the plaintiff may prove helpful to the factfinder. The Phelpses did not testify that they would have declined corrective surgery on their child's clubfoot if they had been informed of the increased risk of post-operative wound infection in children with spina bifida. Moreover, both Dr. Dempsey and Dr. MacEwen testified that had corrective surgery not been performed on the child's clubfoot, the deformity would have worsened and would have led to the onset of further complications that might have resulted in amputation of the entire foot at a later date. Thus, we conclude that the Phelpses did not present substantial evidence that had they been informed of the increased risk of post-operative wound infection, they, acting as reasonably prudent parents, would have declined the surgery. The trial court properly directed the verdict in favor of Dr. Dempsey on this claim. That portion of the judgment based on the directed verdict is affirmed.
 II.
The Phelpses argue that the circuit court should have granted their motion for a new trial because, they claim, that court had erred in granting Dr. Dempsey's motion in limine[1] seeking to exclude the expert testimony and other evidence regarding the color Doppler testing on James, Jr. "A strong presumption of correctness attaches to a trial court's ruling on a motion for new trial, and the ruling will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error." McDowell v.Key, 557 So.2d 1243 (Ala. 1990). The Phelpses contend that the evidence of the color Doppler testing, which they say shows the child's right foot is normally vascularized, was not subject to the court's pre-trial discovery order because it was evidence rebutting Dr. Dempsey's defense that the child suffers from a vascular abnormality in the right foot, rather than part of their prima facie case, as the trial court apparently determined. In response, Dr. Dempsey argues that "[a] fundamental premise of the [Phelpses'] claim-in-chief . . . was that James Phelps, Jr., had normal blood supply to his right foot at the time of the clubfoot surgery" and that "the plaintiffs had the burden of proof at trial on that issue."
As to documents and other physical evidence, the circuit court's pre-trial order states:
 "1. EXHIBITS, DOCUMENTS, AND PHYSICAL EVIDENCE, GENERALLY
 "a. Each party shall make all documents, exhibits, and physical evidence, or copies thereof, expected to be used in the case in chief
available to the other parties, not less than 21 days before trial for inspection and copying. . . . The requirement does not apply to documents, exhibits, and physical evidence used solely as impeachment evidence.
 "b. Documents, exhibits, or physical evidence not timely exhibited to or made available to other parties prior to trial under this Order will not be admitted into evidence at the trial unless solely for impeachment purposes or unless the ends of justice so require."
(Emphasis added.) The language and meaning of the circuit court's pre-trial discovery order are clear. Any documents or other trial exhibits that are part of a party's case-in-chief must have been made available to the opposing party at least 21 days before trial or they will not be admitted into evidence, unless they are used solely for impeachment *Page 382 
purposes or the ends of justice require their admission. Thus, under the terms of the discovery order, a party need not have disclosed documents or other trial exhibits to his opponent if that evidence is not a part of his prima facie case or if it is used solely for rebuttal purposes.
Was it a part of the Phelpses' prima facie case, alleging that Dr. Dempsey was negligent in his post-operative care of James, Jr., to prove that the child's right foot is normally vascularized? We conclude that Dr. Dempsey bore the burden of proof in showing that James, Jr., suffered from a vascular abnormality that caused an insufficient blood flow in his right foot during the period of post-surgical wound healing and that that abnormality was ultimately the cause of the death of tissue in the child's foot. Dr. Dempsey offered the expert testimony of Dr. Hootnick, who testified as to the results of certain reported studies and as to his own observations of other clubfoot patients. Dr. Dempsey offered no direct evidence that James, Jr., suffered from a vascular abnormality. We conclude that the color Doppler test evidence excluded by the trial court was not a part of the Phelpses' case-in-chief alleging medical malpractice, but was instead evidence to rebut the circumstantial evidence presented by Dr. Hootnick on behalf of Dr. Dempsey. Accordingly, we conclude that the documents showing the results of the color Doppler tests were, as a matter of law, outside the scope of the circuit court's pre-trial discovery order.
Further, although in their October 29, 1993, answer to Dr. Dempsey's interrogatories the Phelpses did not note any plan for James, Jr., to undergo the color Doppler testing, those interrogatories were phrased so to ask only for the results of such medical tests that had already been performed. On December 3, 1993, shortly after they had obtained the test results, the Phelpses properly amended their answer to those interrogatories, and, by doing so, they complied with Rule 26, Ala.R.Civ.P.
For the reasons stated above, we conclude that the trial court erred in granting Dr. Dempsey's motion in limine as it related to the documents showing the results of the color Doppler tests. Because the trial court erred in ruling that the Phelpses could not admit those documents at trial, we must conclude that it also erred in denying the Phelpses' motion for a new trial. Thus, we reverse that portion of the trial court's judgment based on the jury verdict, and we remand this cause for that court to grant the Phelpses' motion for a new trial.
The Phelpses did not strictly comply with the circuit court's pre-trial discovery order in relation to the expert witnesses they wished to have testify regarding the results of the color Doppler tests. However, once the circuit court grants the Phelpses a new trial, the times set out in any discovery order will start anew. The Phelpses will then have an opportunity to properly name before trial those expert witnesses they wish to call to testify regarding the results of the color Doppler tests.
The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, INGRAM and COOK, JJ., concur.
[1] This Court has previously recognized two types of motions in limine, "prohibitive preliminary" and "prohibitive absolute."Keller v. Goodyear Tire Rubber Co., 521 So.2d 1312 (Ala. 1988). Preliminary motions in limine seek only to prohibit the opposing party from offering or mentioning certain evidence without first obtaining a ruling from the judge during trial.Id. at 1313. With a preliminary motion in limine, the non-moving party must make an offer of proof and indicate why the evidence should be admitted, in order to preserve for review any error in the court's ruling. Id. However, with an absolute motion in limine, no such offer of proof need be made at trial in order to preserve for review any alleged error in the trial court's order granting such a motion, Id. The motion in limine in this case was an absolute motion in limine.