[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 568 
Onzell V. Cain sued Dr. Graham L. Howorth, a board-certified orthopedic surgeon, and his professional corporation, Graham L. Howorth, M.D., P.C., on various claims of medical malpractice arising from a hip-replacement operation Dr. Howorth performed on Cain.[1] Dr. Howorth filed a motion for a summary judgment, supporting it with his deposition testimony and affidavit. In his affidavit, Dr. Howorth refuted every claim asserted against him in Cain's complaint. Cain filed a response to Dr. Howorth's motion, and attached the affidavit of Dr. Steven Nehmer, a board-certified orthopedic surgeon and her expert witness; Dr. Howorth's deposition testimony, as well as her own; his office notes concerning her; the hospital records for her admission and the surgery by Dr. Howorth; and office and hospital medical records of Dr. John Featheringill, another orthopedic surgeon. On August 19, 2002, the trial court entered summary judgments for Dr. Howorth and Graham L. Howorth, M.D., P.C., as to all claims. Because the claims of Dr. Howorth and Graham L. Howorth, M.D., P.C., are intertwined, we will hereinafter refer to both Dr. Howorth and Graham L. Howorth, M.D., P.C., as Dr. Howorth. Cain appeals. We affirm in part, reverse in part, and remand.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that *Page 569 
fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543
(quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
 I. Facts
Cain was working as a nurse's aide at Coosa Valley Medical Center when she fell and sustained "a fracture of the left femoral neck displaced." She was taken to the emergency room of that hospital and given her choice of two doctors; she chose Dr. Howorth because "he did the majority of the surgery there." On December 30, 1997, he performed a bipolar hip arthroplasty[2] on her. In a post-hospitalization clinic note, dated October 6, 1998, Dr. Howorth stated that Cain reported that she was still experiencing pain and that he "had discussed with her that the only alternative with her at this point would be to revise her total hip arthroplasty and [he did] not feel that this need[ed] to be performed." On November 30, 1998, because of continued pain in her hip, Cain sought a second opinion from Dr. Featheringill, who informed her that she had not undergone a total hip arthroplasty (hereinafter "THA"), which she alleges she thought she had undergone, but rather she had undergone a bipolar hip arthroplasty (hereinafter "BHA"). In his office notes dated November 30, 1998, Dr. Featheringill stated:
 "Dr. Howorth treated her with what appears to me to be a bipolar prosthesis although in his office notes he refers to it as a total hip. . . . Again it appears to me that she has a bipolar prosthesis, not a total hip. There is no acetabular cartilage present. I don't know if this was reamed at the time of surgery. I would like to get the op notes from Dr. Howorth to know what was really put in."
In his office note dated December 1, 1998, entered after he had seen Dr. Howorth's operative report, Dr. Featheringill stated that the prosthesis in Cain's hip was an universal head and that he had "checked with the part rep and it is a bipolar [prosthesis] for sure." On February 17, 1999, Dr. Featheringill performed surgery on Cain and revised the BHA Dr. Howorth had performed on her left hip, converting it to a THA. Dr. Featheringill recorded in his "report of operation" that "[t]here was no acetabulum cartilage present. Whether this had been reamed from the previous procedure or whether it had just worn away, was uncertain."
In her deposition, Cain asserts that Dr. Howorth advised her that she needed to undergo a THA and he recommended only that procedure to her. She testified as follows:
 "Q: Did he discuss with you how an injury like that should be repaired?
 "A: He told me that he would put a total hip replacement in, and I shouldn't have any more problems with it.
"Q: Did he ever discuss with you any other method of treatment?
"A: No." *Page 570 
Dr. Howorth, on the other hand, testified in his deposition as follows, in part:
 "Q: Do you specifically remember telling her that the procedure of choice was a hip arthroplasty and a replacement of the ball?
"A: I do.
 "Q: Anything else you specifically remember other than what you generally may tell [patients]?
 "A: I remember that she was very inquisitive, much more so than normal patients, and I think that she worked in the health-care area. And so she had specifically more questions about the procedure than I think the average person. And I think that I explained that to her in great detail.
". . . .
 "Q: Did you describe for her any difference in the procedure that she was going to undergo and left total hip?
"A: Yes.
"Q: What did you tell her about the left total hip?
 "A: Well, we talked about hip arthroplasty with the swivel socket, and we talked about fixed versus a swivel socket. And I told her that she would have a swivel socket. . . .
". . . .
 "Q: And what you say is that with a femur fracture like she had, the swivel type is more indicated as versus the fixed?
"A: Yes.
". . . .
 "Q: And when [you were] doing this swivel one, what do you call it in the medical records?
 "A: Well, usually hip arthroplasty bipolar, but I do use THA, because it's just very convenient. . . . But I just say, THA, bipolar THA total and use that word interchangeably with bipolar a lot of times, so it can really — it can be confusing.
 "Q: So you sometimes use total hip arthroplasty to be used interchangeably with bipolar hip arthroplasty?
 "A: Well, in just normal, average day discussion unless we're discussing it more specifically, yes, I do.
". . . .
 "Q: . . . When [you were] talking to Cain, did you ever tell her, You're going to have to have a left total hip?
 "A: I don't really know if I said total hip. I said, We're going to replace your hip. I don't really even differentiate or talk in that terminology to her. I said, `We're going to replace your hip with a stem, replace the ball and replace the socket with a swivel socket.' If I was going to more correctly describe a total hip, I'd say, `We're going to use a fixed socket in there.' And I don't really even — in talking to patients, I don't really use the word total hip or bipolar or endoprosthesis or bipolar or hemi-arthroplasty, because I think that's very confusing to them.
". . . .
 "Q: Had you described this procedure to Cain as a left hip arthroplasty? Did you ever use those terms?
"A: I don't really recall.
 "Q: Do you remember if you ever told her, `I recommend a left total hip'?
"A: I don't recall.
". . . .
 "Q: Did you ever use the terms with her that namely you are going to have or have had a left total hip?
"A: No.
 "Q: Would you have ever used the term with her that you have had a left bipolar arthroplasty?
"A: No, probably not." *Page 571 
Testifying further concerning the proper usage of the terms THA and BHA and other related terms, Dr. Howorth stated:
"Q: Is a left hip arthroplasty different from a left total hip?
 "A: A total hip is a little more descriptive term for hip arthroplasty.
 "Q: Is there any difference in a left hip arthroplasty and a total left hip?
 "A: Well, I think that they could both be the same or they could both be different.
". . . .
 "A: . . . As I say, I think that a total hip arthroplasty is more descriptive and left hip arthroplasty could mean many things.
 "Q: . . . Okay. What does left hip arthroplasty — what could it mean?
 "A: That could mean total hip. That could mean bipolar hip or hemi-arthroplasty. That could mean resection hip arthroplasty. I think that's the more generic term for hip arthroplasty.
 "Q: So left hip arthroplasty could mean left total hip, left bipolar endoprosthesis and what else?
"A: Bipolar.
"Q: Just bipolar?
 "A: Bipolar hip arthroplasty. I think it could mean a hemi-arthroplasty. I think it could mean resection arthroplasty. It's just I think a more generic term.
". . . .
 "Q: . . . In this particular case, when you said left total hip, did you envision changing or putting in the ball and the acetabulum component?
". . . .
 "A: Well, we used a swivel socket, which is really a bipolar hip arthroplasty. It's really not a total hip. It's a bipolar hip arthroplasty or endoprosthesis or just — really meaning a hip arthroplasty.
". . . .
 "Q: I think my question was tell me all of the names that you would use for the type of procedure that she underwent; namely, with the swivel. Obviously you use left hip arthroplasty.
 "A: Left hip arthroplasty, bipolar hip arthroplasty, endoprosthesis you can use.
 "Q: Would you call it just endoprosthesis or bipolar endoprosthesis?
 "A: More correctly, it would be probably bipolar endoprosthesis. But if you were just talking about it, I would still call it that. It's just a lot of names that we use that — for that.
 "Q: What about in medical records? When you write to other physicians, when you talk about in your medical records the type of procedure you did on her, you would sometimes call it bipolar hip arthroplasty and what else?
 "A: Hip arthroplasty. Usually I would use hip arthroplasty bipolar or hip arthroplasty total or total hip arthroplasty bipolar. Sometimes I just kind of mingle them together.
"Q: And sometimes you also call it a total hip arthroplasty?
 "A: I might. Total hip arthroplasty bipolar, which would be — just because that acronym is — that THA is just so embedded, you know, it's really not quite correct. But often you would do that by mistake or just for brevity to use that.
 "Q: So on the kind of procedure you had, sometimes you'd call it a bipolar hip arthroplasty, sometimes bipolar arthroplasty, sometimes hip arthroplasty, sometimes endoprosthesis, sometimes total hip arthroplasty, all of those, correct? *Page 572 
 "A: Just in discussing it, you might say that, but they're not all totally correct for that procedure. It's bipolar really or endoprosthesis.
 "Q: If you say total hip arthroplasty, is that a correct terminology?
". . . .
 "A: I don't think it's totally correct for her exact procedure, no.
 "Q: . . . Is it correct if you say bipolar total hip arthroplasty?
 "A: That's not really totally correct either. It would probably be just bipolar hip arthroplasty, or hemi-arthroplasty is another word that we use for that. Bipolar hemi-arthroplasty.
 "Q: When you use the fixed type that you described earlier versus the swivel, what are the terms for that?
 "A: Well, you just use total hip arthroplasty, or you might just say hip arthroplasty.
"Q: You would not use the term bipolar then, would you?
"A: Not really for that.
"Q: And what does the bipolar refer to?
 "A: The bipolar is mostly the acetabulum component, which is a swivel type component in a bipolar or a lot of those others, hemi-arthroplasty, endoprosthesis. And a total hip is you're more or less saying a fixed acetabulum component."
Responding to questions about the details of the surgery he performed on Cain, Dr. Howorth testified:
"Q: Now, in her, did you put in an acetabulum component?
 "A: I put in a bipolar component, which fits in the acetabulum.[3] It's 44 millimeters, but it's not a fixed or cemented acetabulum component, which would be a total hip.
". . . .
 "A: . . . In a total hip, instead of attaching this to the ball and then letting it go into the acetabulum or socket, we squeeze this outer shell in and we put plastic inside of it or cement it. In a bipolar, we have a head and then plastic already on it and then a shell that kind of shapes onto the ball head. And then that fits into the acetabulum. So it's just a little bit different.
 "Q: Well, when you do the left hip arthroplasty, do you have to actually grind her acetabulum to make it fit?
 "A: When you do a left hip arthroplasty, do you have to grind it?
"Q: Correct.
"A: You don't have to, no.
"Q: In her, did you grind her acetabulum?
"A: I don't recall, but usually do not.
 "Q: Would your records, namely your operative report, tell whether or not you both reamed or ground her acetabulum?
 "A: It's in the operative records, but I believe that's incorrect.
"Q: You say it's in the operative record that what, that you —
"A: That progressive acetabulum reaming was performed.
"Q: And you think that is incorrect?
"A: I do, because that's not what I usually do.
 "Q: In other words, when you are not putting in an acetabulum, you normally don't ream it?
 "A: Well, when we put in a bipolar head, you would ream it minimally and *Page 573 
save as much cartilage as possible unless the socket was eccentric and you needed to make it more spherical.
". . . .
 "Q: With the total hip arthroplasty, do you have to ream out the patient's acetabulum?
"A: Yes.
 "Q: And in her particular instance even though it says you reamed out the acetabulum, you would not have reamed it out for a left hip arthroplasty?
 "A: It would not be the extent of reaming for a hip arthroplasty, which that really takes like a minute, at most five minutes to ream the hip, to do a hip preparation in that regard. It's less important.
". . . .
 "Q: So back when you were treating her, you normally would not ream the acetabulum?
"A: That's correct.
"Q: You wouldn't ream it at all then, would you?
 "A: Or very slightly on the peripheral ream so that the socket fit properly.
". . . .
 "Q: If, in fact, under these conditions you didn't ream it or maybe reamed it just a little bit, would the wear and tear after a period of time cause it to look as though it had been reamed?
"A: It could.
 "Q: Why would it look like that? What mechanism would cause it to look like it had been reamed?
 "A: Well, you could have cartilage degeneration and loss of cartilage, and you then would have raw looking bone.
". . . .
 "Q: You would not have reamed it to the point, though, that there was no cartilage remaining, would you?
 "A: In the past, we did. But in 1997 when that was done, I don't think that would be the case, no.
 "Q: And you would not want to ream it so much that all of the cartilage was gone in '97, right?
"A: I don't believe so.
 "Q: And if, in fact, you put in this type of device in her, would that likely cause the cartilage to be completely gone within a year?
 "A: Well, we would hope that it would not. All patients are a little bit different, but I would not think that all of the cartilage would be gone in a year."
Cain's expert witness, Dr. Steven L. Nehmer, a board-certified orthopedic surgeon licensed to practice in New Jersey, attested as follows in his affidavit:
 "Within the one (1) year prior to December 29, 1997, I was actively engaged in the private practice of orthopedic surgery in Union, New Jersey on the staff of and admitting patients to hospitals in New Jersey and performing similar procedures as performed by Dr. Graham Holworth [sic]. I am familiar with the standard of care which is required of an orthopedic surgeon such as Dr. [Howorth] in the national medical community as of December 29, 1997. I am giving my opinions based upon reasonable medical certainty as to the care and treatment provided to Onzel [sic] Cain by Dr. [Howorth].
 "I reviewed the medical records from Dr. [Howorth], Coosa Valley Medical Center, Dr. John Featheringill as well as the depositions of Onzel[l] Cain and Dr. [Howorth]. Assuming Dr. [Howorth] performed a left bipolar hip artheroplasty [sic] as described in his deposition, the standard of care in the national medical community for orthopedic surgeons did not include reaming *Page 574 the acetabulum. If, in fact, Dr. [Howorth], reamed the acetabulum in his performance of a left bipolar hip artheroplasty [sic] in Onzel[l] Cain, the reaming of the acetabulum would be below the standard of care in the national medical community. You normally only would ream the acetabulum if there was arthritis and you were performing a total hip arthroplasty. One of the known complications with the reaming of the acetabulum is that pain could be produced as a result of the reamed acetabulum."
(Emphasis supplied.)
Dr. Howorth testified that he initialed the hospital order in which he directed a nurse to get a permit for, and to schedule, a THA. On December 30, 1997, Cain signed two forms, each captioned "Authorization For Medical Treatment, Administration of Anesthesia and the Performance of Operations and/or Procedures." She signed the first form at 12:30 a.m.; it stated that she authorized Dr. Howorth to perform an "open reduction internal fixation or total hip arthroplasty as indicated left hip," but that document was later voided by a large X drawn across its face. The second form, signed at 10:55 a.m., stated that she consented for Dr. Howorth to perform an "open reduction internal fixation/left hip arthroplasty." Although Cain could not recall at her deposition the circumstances of signing either form, she acknowledged that each bore her signature. The "history and physical" information sheet contained in the hospital chart stated that Cain was being admitted for a THA. Concerning that particular entry and referencing the fact that his "op note" had referred to a THA, Dr. Howorth explained:
 "Q: In the history and physical, when you said admit for total hip arthroplasty, that was dictated after the procedure was completed, wasn't it? Down at the bottom, it's got 1/23/98, and there's a D in front of it.
"A: Dictated 1/23/98. That would indicate that, yes.
 "Q: And do you remember if you had a good recollection of what you had done for her when you dictated this?
 "A: Well, in the discharge summary and this, it would be late. See, I would just go back and refer to the op note. And if I looked at the op note and it said that, I would just kind of say that right off the top. And I wouldn't really remember too well. So if that was in error the first time, it would just be repeated."
The anesthesia record also stated that the scheduled operation was a left "total hip." The three-page "operative procedure" report signed by Dr. Howorth included an introductory heading stating that the "operation performed" was a "left total hip arthroplasty." However, the "recovery room record" described the procedure performed as a "left bipolar hip replacement," and the "operating room record" stated that the operation performed was a "left bipolar hip replacement." In most of his notes of Cain's follow-up office visits, Dr. Howorth referred to the operation as a "left total hip arthroplasty."
In further describing the difference between the terms left THA and left hip arthroplasty, Dr. Howorth explained at his deposition that "[a] total hip is a little more descriptive term for hip arthroplasty," and stated:
 "A: . . . . Total hip arthroplasty is one that's cemented, or it's a total hip where the socket is cemented or pressed into position.
". . . .
 "Q: Now, is a total hip arthroplasty the combination of the ball and the acetabulum cemented? *Page 575 
 "A: Well, in a total hip, you can have the ball and the acetabulum cemented or not cemented. They both can be cemented, or they both can be just pressed into position. Or you can have one cemented and one not cemented, which is called a hybrid. But you can do any combination of those for a total hip arthroplasty.
 "Q: If you have a total hip — if you have a left total hip, does that mean you have an acetabulum component that you put in that's artificial?
"A: Well, that's correct.
 "Q: So it sounds like the difference in a left total hip and what you described as a left hip arthroplasty is in the left total hip, you have an acetabulum component that you put in?
 "A: That's correct. In a total hip, there's either — there's a fixed socket that's either cemented or pressed into position. In just a hip arthroplasty bipolar, that socket is put in, but it's a swivel socket. It swivels in the acetabulum. But you still have kind of a socket component. It's just called a bipolar head."
Dr. Howorth testified that although he dictated in the discharge summary that Cain's surgery was a THA, he was using that term interchangeably with BHA even though BHA "would be more accurate," and that using the term THA for what he did in Cain's case could confuse other physicians.
 II. Pleading and Procedural Considerations.
In determining whether the summary judgment for Dr. Howorth was proper, we must consider the interplay of several applicable rules of pleading and procedure, some of which are peculiar to medical-malpractice actions.
Under Rule 8, Ala.R.Civ.P., a complaint is sufficient if it puts the defendant on notice of the claims against him; however, the rule of generalized notice pleading may be qualified by rule or statute. Bethelv. Thorn, 757 So.2d 1154, 1158 (Ala. 1999). Section 6-5-551, Code of Ala. 1975, provides that in any medical-malpractice action, "[t]he plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff." The plaintiff is prohibited "from introducing at trial evidence of any other act or omission."
Substantial evidence is defined in the medical-malpractice context as "that character of admissible evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed." § 6-5-542(5). Rule 56, Ala.R.Civ.P., governing motions for summary judgment, must be read in conjunction with that definition of substantial evidence. Golden v. Stein, 670 So.2d 904, 907 (Ala. 1995).
This Court's review of a summary judgment in a medical-malpractice case, as in other cases, is guided by the proposition that "this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant." Hobson v.American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997), quoted inHauseman v, University of Alabama Health Servs. Found., 793 So.2d 730,734 (Ala. 2000).
If the movant in a medical-malpractice case makes a prima facie showing that there is no genuine issue of material fact, then, as in other civil cases, the burden shifts to the non-movant to present substantial evidence creating such an issue. Ex parte Elba Gen. Hosp. Nursing *Page 576 Home, Inc., 828 So.2d 308, 311 (Ala. 2001).
 "To maintain a medical-malpractice action, the plaintiff ordinarily must present expert testimony from a `similarly situated health-care provider' as to (1) `the appropriate standard of care,' (2) a `deviation from that standard [of care],' and (3) `a proximate causal connection between the [defendant's] act or omission constituting the breach and the injury sustained by the plaintiff.'"
Lyons v. Walker Reg'l Med. Ctr., 791 So.2d 937, 942 (Ala. 2000) (bracketed language original).
 "[A] medical malpractice plaintiff must produce substantial evidence that `the alleged negligence "probably caused the [complained of] injury,"' in order to survive a summary judgment motion, if the defendant has made a prima facie showing that no genuine issue of material fact exists as to the issue of causation."
Golden, 670 So.2d at 907.
 "'To present a jury question, the plaintiff [in a medical-malpractice action] must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have "selective application" to one theory of causation.'"
Rivard v. University of Alabama Health Servs. Found., P.C., 835 So.2d 987,988 (Ala. 2002).
In most medical-malpractice cases, the element of proximate cause, i.e., that the breach of the standard of care probably caused the ensuing injury, must be established by expert testimony. Golden,670 So.2d at 907. However, as recently discussed by this Court in Ex parte HealthSouthCorp., [Ms. 1011582, Nov. 27, 2002] 851 So.2d 33, 44 (Ala. 2002), there exists an exception to that requirement where the cause-and-effect relationship between the breach of the standard of care and the subsequent complication or injury is so readily understood that a layperson can reliably determine the issue of causation without expert testimony to assist in that determination.
 III. Claims Pleaded by Cain
Cain averred in her complaint that "she was advised that she should and would undergo a total hip arthroplasty but instead underwent a bipolar endoprosthesis." She further alleged that Dr. Howorth
 "negligently performed a left total hip arthroplasty on Onzell V. Cain; negligently, wantonly and/or intentionally advised Onzell V. Cain that she was to undergo a left total hip arthroplasty; negligently, wantonly and/or intentionally advised Onzell V. Cain, after the surgery and when she complained of pain, that she had undergone a left total hip arthroplasty; negligently, wantonly and/or intentionally failed to place an acetabulum component in her at the time of the surgical procedure; negligently, wantonly and/or intentionally advised Onzell V. Cain's subsequent treating physician that she had undergone a left total hip arthroplasty; negligently hindered Onzell V. Cain's subsequent physician that she had undergone a left total hip arthroplasty; negligently performed a bipolar endoprosthesis; negligently failed to properly advise Onzell V. Cain when she complained of pain that she had undergone a bipolar endoprosthesis rather than a total hip arthroplasty; negligently failed to appropriately care for and treat Onzell V. Cain subsequent to the surgery at Coosa Valley Medical Center by continuing to advise her that she had undergone a left *Page 577 
total hip arthroplasty; negligently failed to detect the absence of an acetabulum component in Onzell V. Cain; negligently, wantonly and/or intentionally failed to install a[n] acetabulum component at the time of the left total hip arthroplasty; negligently, wantonly and/or intentionally deceived and kept Onzell V. Cain from learning that she had not undergone a left total hip arthroplasty at Coosa Valley Medical Center on December 30, 1997; negligently caused, allowed or permitted excessive pain in Onzell V. Cain subsequent to the surgical procedure; negligently failed to evaluate the effectiveness of the surgery performed at Coosa Valley Medical Center on December 30, 1997; negligently caused, allowed or permitted Onzell V. Cain to become dependent upon a quad cane; negligently failed to diagnose that left total hip arthroplasty had not been performed on Onzell V. Cain at Coosa Valley Medical Center by negligently interpreting X-rays taken of the left hip; negligently returned Onzell V. Cain to light duty work; negligently caused, allowed or permitted her to develop left trochanteric bursitis; negligently caused, allowed or permitted Onzell V. Cain's to develop gluteus medius aurch;[4] negligently caused, allowed or permitted Onzell V. Cain disability to be exacerbated; . . . and negligently cared for and treated Onzell V. Cain."
 IV. Claims Argued by Cain in Her Brief to this Court
In her initial brief, Cain asserts that in her complaint she "specifically alleged that all healthcare providers . . . on December 30, 1997"
 "[1] [n]egligently, wantonly, and/or intentionally advised her that she was to undergo a left total hip arthroplasty; [2] negligently, wantonly, and/or intentionally failed to advise Cain upon her complaint of pain, that she had undergone a left biopolar endoprosthesis, something less than a left total hip arthroplasty; [3] negligently, wantonly, and/or intentionally failed to install an acetabulum component at the time of Cain's left total hip arthroplasty; and [4] negligently caused Cain to develop post-operative complications including gluteus medius aurch[5] as a result of the failure to perform a left total hip arthroplasty."
(Cain's brief, p. 6.) She states that her "claims against Howorth relate to Howorth's failure to perform a left total hip arthroplasty, also known as a left total hip." (Cain's brief, p. 8.) "Cain claims that Howorth advised her that he would perform a left total hip" because it was "the procedure of choice for her," whereas he now claims that "he advised Cain that he suggested and did perform a left bipolar endoprosthesis." (Cain's brief, p. 8.) She also states that "Howorth claims he performed a left hip arthroplasty rather than left total hip arthroplasty," but that she "disputes" that claim. She further asserts that "Howorth failed to prove, as a matter of law, that he obtained an informed consent from Cain for the performance of anything less than a left total hip." (Cain's brief, p. 16.) She acknowledges, however, that her claims in that regard "are not like most lack of informed consent cases" in which "the failure to obtain consent relates to complications which arose during the procedure for which the patient *Page 578 
was not fully informed that were associated with the procedure." (Cain's brief, p. 21.)
She asserts that had Howorth performed the left total hip procedure, she would not have suffered pain in her hip and would not have had to undergo a subsequent left total hip revision by Dr. Featheringill. (Cain's brief, pp. 21-22.) She argues alternatively that Howorth "planned to perform" a THA, but failed to install an acetabulum component. (Cain's brief, p. 24.) She states that he actually performed a BHA but "reamed the acetabulum" and that "reaming of the acetabulum in the performance of a left bipolar hip arthorplasty would be below the standard of care in the national medical community." (Cain's brief, p. 25.)
Comparing the claims Cain pleaded in her complaint with the claims she argues in her brief to this Court, we find that she adequately brings forward for our consideration her claims, as rephrased for convenience, that Dr. Howorth planned to perform a THA, but negligently, wantonly, or intentionally failed to install an acetabulum component; that he negligently, wantonly, and/or intentionally advised her that she was to undergo, and had undergone, a left THA and she had consented only to a THA; and that he "negligently performed a bipolar endoprosthesis," i.e., a BHA, by excessively reaming the acetabulum.
As noted, Cain also argues the viability of a claim of lack of informed consent. Dr. Howorth asserts that Cain never pleaded that claim in any fashion and that she is simply arguing on appeal a claim she did not plead or otherwise present to the trial court. (Dr. Howorth's brief, pp. 27-28.) Citing Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992), for the proposition that "[t]his Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court," Dr. Howorth contends that Cain cannot rely on a basis for reversal she is presenting for the first time on appeal. (Dr. Howorth's brief, pp. 28-29.) We recently restated that proposition in Ex parte Elba General Hospital Nursing Home, Inc., 828 So.2d at 311-12:
 "As a general rule, an appellate court will not reverse a summary judgment on a ground not presented in the trial court.
 "'[T]he appellate court can consider an argument against the validity of a summary judgment only to the extent that the record on appeal contains material from the trial court record presenting that argument to the trial court before or at the time of submission of the motion for summary judgment.'
 "Ex parte Ryals, 773 So.2d 1011, 1013 (Ala. 2000) (citing Andrews v. Merritt Oil Co., 612 So.2d 409
(Ala. 1992)). Put another way, on an appeal from a summary judgment, this Court cannot hold the trial court in error on the basis of arguments made for the first time on appeal. See Barnett v. Funding Plus of America, Inc., 740 So.2d 1069 (Ala. 1999); West Town Plaza Assocs., Ltd. v. Wal-Mart Stores, Inc., 619 So.2d 1290 (Ala. 1993)."
In her reply brief to this Court, Cain responds by stating that her
 "complaint, although not exactly [asserting] a lack of informed consent claim, relates to her claim that [Dr.] Howorth advised her that he would perform a left total hip and performed something less, namely, he reamed the acetabulum as though he was going to insert an artificial acetabulum component but failed to insert an artificial acetabulum component thereby causing the components to rub together due to the lack of an acetabulum *Page 579 
component and absence of acetabulum cartilage thus producing pain in her left hip which she endured for 13 and ½ months until Dr. Featheringill performed a left total hip."
(Cain's reply brief, p. 21.) However, nowhere in Cain's complaint, her other submissions to the trial court, or her deposition testimony did she ever contend that she had consented to a BHA but that her consent to that procedure was not informed. Rather, she adamantly insisted throughout that the only procedure identified and recommended to her by Dr. Howorth, and the only procedure she consented to, was a THA. At no time, so far as the record reveals, was the concept of informed consent ever mentioned to the trial judge. The affidavit of Cain's expert, Dr. Nehmer, does not allude to that issue in any way and does not otherwise discuss the nature of the operative procedure Cain consented to or whether her consent to that procedure was informed. This Court has considered the nature of a "lack of informed consent" claim in a number of cases, including Johnson v.McMurray, 461 So.2d 775 (Ala. 1984), Fain v. Smith, 479 So.2d 1150 (Ala. 1985), Otwell v. Bryant, 497 So.2d 111 (Ala. 1986), Fore v. Brown,544 So.2d 955 (Ala. 1989), Craig v. Borcicky, 557 So.2d 1253 (Ala. 1990), Horton v. Shelby Med. Ctr., 562 So.2d 127 (Ala. 1990), Bodifordv. Lubitz, 564 So.2d 1390 (Ala. 1990), Phelps v. Dempsey, 656 So.2d 377
(Ala. 1995), and Golden v. Stein, 670 So.2d 904 (Ala. 1995).
In Horton, 562 So.2d at 130, this Court summarized one of the holdings in McMurray, supra, as follows: "[I]n the medical malpractice context, those claims that involved allegations of lack of informed consent are essentially fraud cases." 562 So.2d at 130. In McMurray, the patient who suffered a bad result after surgery performed by a doctor he had expressly rejected sued, alleging, among other things, fraud and assault and battery. The thrust of the claim was that after the patient had refused to sign a consent form with that surgeon's name on it, he had been presented with, and signed, a consent form identifying another surgeon as the surgeon authorized to perform the procedure, along with "his assistant." 461 So.2d at 777. This Court held that there was evidence from which it could be reasonably inferred that the rejected physician, who performed the operation as an "assistant," had "failed to inform" the patient of that plan, and that those circumstances were sufficient to support the fraud claim. 461 So.2d at 778-79. Independent of the heightened pleading requirements imposed in a medical-malpractice action by § 6-5-551, Code of Ala. 1975, Rule 9(b), Ala.R.Civ.P., states, in pertinent part, that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."
 "The elements of a cause of action against a physician for failure to obtain informed consent are: (1) the physician's failure to inform the plaintiff of all material risks associated with the procedure, and (2) a showing that a reasonably prudent patient, with all the characteristics of the plaintiff and in the position of the plaintiff, would have declined the procedure had the patient been properly informed by the physician."
Phelps, 656 So.2d at 380.
Cain acknowledges that formulation of elements in her brief, citingPhelps. As we noted, she concedes in her reply brief that what she alleges in her complaint is "not exactly a lack of informed consent claim," but "relates to her claim that Howorth advised her that he would perform a left total hip and performed something less. . . ." (Cain's reply brief, p. 21.) Cain *Page 580 
did assert in her complaint, as the last of her listing of acts or omissions on the part of Dr. Howorth, that he "negligently cared for and treated" her. Cain does not argue in either of her briefs that this allegation is broad enough to satisfy the special rules for pleading in a medical-malpractice action as to a claim of lack of informed consent. Moreover, in Horton, supra, this Court implicitly held that a bare-bones allegation of "negligent treatment" would not suffice as pleading lack of informed consent.
Just as we concluded in Craig, supra, we now conclude, based on a thorough analysis of what Cain pleaded and argued to the trial court, that "this is not a case of `informed' consent where the question is whether the patient would have consented if all known risks had been disclosed; rather, it is a question of whether she consented at all to the injury-producing procedure, which was significantly different from the . . . procedure to which she concededly did consent."557 So.2d at 1259.
In concluding that Cain alleged and argued to the trial court only a claim of "no consent" to the BHA, we do not ignore the fact that the second medical authorization form she signed described the proposed procedure as an "open reduction internal fixation/left hip arthroplasty." Given that Dr. Howorth took the position in his deposition that "left hip arthroplasty could mean many things," including both a "total hip" and a "bipolar hip," and reiterated in his subsequently filed affidavit that, "[a]s I stated in my deposition, the [left hip arthroplasty] procedure can be called a number of things including left total hip arthroplasty, bipolar endoprosthesis, left hip arthroplasty, etc.," we do not find the use of term left hip arthroplasty in the consent form to be significant.
Accordingly, Cain's claim that she was aware of only, that Dr. Howorth recommended only, and that she consented to only, a "total hip," and that she had never even heard of a bipolar procedure until Dr. Featheringill explained it to her, is not refuted by the use in the authorization form of the all-purpose term "left hip arthroplasty." Dr. Howorth acknowledged that he was not "present in the room when the nurse talked with [Cain] to get the informed consent signed." The parties do not discuss, and the record does not inform us of, the circumstances surrounding the execution of either of the authorization forms or the voiding of the first one.
In Donald v. Swann, 24 Ala. App. 463, 137 So. 178 (1931), the Court of Appeals held that a medical procedure performed without the consent of a patient constituted an assault and battery or a trespass to the person. This is likewise the view taken in Daum v. SpineCare Med. Group, Inc.,52 Cal.App.4th 1285, 61 Cal.Rptr.2d 260 (1997), where, quoting an earlier opinion of the California Supreme Court, the court stated:
 "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information." *Page 581 
52 Cal.App.4th at 1313, 61 Cal.Rptr.2d at 276. Similarly, in Doe v. Noe,293 Ill. App.3d 1099, 1113, 690 N.E.2d 1012, 1026, 228 Ill. Dec. 937, 946 (1997), vacated, 303 Ill. App.3d 139, 707 N.E.2d 588, 236 Ill. Dec. 461 (1998), the court commented that "[t]he law distinguishes between a total lack of consent for the contested act (battery) and the lack of informed consent (negligence)." In Collins v. Ashurst, 821 So.2d 173 (Ala. 2001), we expressly held that counts alleging "assault and/or battery" and "trespass to the person" could be maintained in a medical-malpractice action, although such an action was otherwise governed by the Alabama Medical Liability Act of 1987. Accordingly, because this Court will not reverse a summary judgment on a ground not pleaded and argued to the trial court, although we will affirm the judgment on a basis not asserted in the trial court (Smith v. Equifax Servs., Inc., 537 So.2d 463, 465
(Ala. 1988)), we do not further consider whether, under the circumstances of this case, Cain could have pleaded a viable claim for lack of informed consent. We simply hold that a lack-of-consent claim explicitly pleaded and argued does not embrace the separate concept of "lack of informed
consent," the latter requiring averment and proof that the doctor failed to inform the patient of the "significant perils," or "all material risks," associated with the procedure for which consent was given.Otwell, 497 So.2d at 118; Craig, 557 So.2d at 1258; Phelps,656 So.2d at 380.
 V. Cain's Lack-of-Consent Claim
As noted, Cain alleged in her complaint that she was "advised [by Dr. Howorth] that she should and would undergo a left total hip arthroplasty," but that he performed instead a bipolar procedure. She further alleged that he told her on a number of postoperative occasions that she had in fact undergone a total hip arthroplasty. She testified in deposition that Dr. Howorth told her that her injury should be repaired by a "total hip" replacement and that he discussed no other procedure. Specifically, there was no discussion of any sort of bipolar procedure. She learned of it as a type of hip repair only when she consulted Dr. Featheringill, who told her she "had the wrong one in there" and "[h]e couldn't understand why."[6] Dr. Featheringill told Cain, according to her, that "he felt like if I'd had the total hip replacement done at first, I would have been able to walk and been without pain"; that "I should have had a total hip replacement [two years ago]." She went on to testify that Dr. Featheringill told her that if she had had a total hip replacement originally, she should not have had any restrictions or impairment and "should be able to walk and do anything that I did before."
In connection with her work in the hospital, she had seen pictures in books and pamphlets of the "hardware" used in a total hip replacement. Cain testified that if Dr. Howorth had told her that she needed a bipolar procedure, she would have had him explain it, and would have asked about "the difference between that and a total hip replacement." She said that if he had explained to her that he believed she needed a bipolar procedure, rather than a total hip replacement, she would not have accepted his recommendation. She testified that she would have told him that she would "much rather have a total hip replacement" and "probably would have asked for another doctor" to obtain "a *Page 582 
second opinion to see if that was, you know, okay." As it was, "[h]is recommendation was a total hip replacement and I agreed."
Reviewing the evidence in a light most favorable to Cain, we conclude that she presented substantial evidence indicating that she did not consent to a BHA, but consented only to a THA. In reaching this conclusion, we are mindful that we, like the trial judge, are not allowed to make any assessments of the plausibility or credibility of Cain's testimony versus that of Dr. Howorth, unless her testimony were to be so incredible and implausible as to lack the status of substantial evidence. Lyons v. Walker Reg'l Med. Ctr., Inc., supra. Accordingly, we accept her testimony as true, resolving all conflicts in her favor, and thereby conclude that there was substantial evidence creating a genuine issue of material fact as to whether Cain consented to a BHA.
Was there also a genuine issue of fact as to the element of proximate cause, i.e., probable causation? We look to Golden, 670 So.2d 904, for the answer. In that case the physician performed what was alleged to be an unnecessary surgical procedure. The Golden Court stated that "a medical malpractice plaintiff must produce substantial evidence that `the alleged negligence "probably caused the [complained of] injury,"' in order to survive a summary judgment motion, if the defendant has made a prima facie showing that no genuine issue of material fact exists as to the issue of causation." 670 So.2d at 907. The Court further noted that in most medical-malpractice cases probable causation must be established by expert testimony because "issues of proximate cause in medical malpractice cases are ordinarily `beyond "the ken of the average layman."'" 670 So.2d at 907. The Court went on to explain, however:
 "[I]n cases like this one, involving allegations that a defendant performed unnecessary medical procedures, the issue of proximate cause is not always `beyond the ken of the average layman.' Clearly, the average layman, without the assistance of an expert, can recognize a causal connection between the performance of an unnecessary operation and most items of harm or injury claimed by the plaintiffs in this case. The cost of the unnecessary procedure, any provable pain and suffering or lost consortium associated with the unnecessary procedure, and any wages that can be proven to have been lost during the normal recovery period for such an operation would constitute harm or damage the proximate cause of which would be `within the comprehension of average laymen.' See Williams v. Spring Hill Memorial Hospital, 646 So.2d 1373, 1375
(Ala. 1994). However, any claims for damages based on complications from the unnecessary procedure would be subject to the general rule that expert testimony is normally required to establish proximate cause in the medical malpractice context."
670 So.2d at 908.
Even more so, in a case of surgery to which the patient has not consented (viewed as such for the purpose of summary-judgment review, based on Cain's testimony), proximate cause may be shown through lay testimony. Here, Cain stated under oath on deposition that she would not have submitted to a BHA had she known it was what Dr. Howorth planned to perform. Therefore, genuine issues of material fact existed as to all elements of Cain's claim that a BHA was performed without her consent, and the summary judgment as to that claim was not warranted, and it is hereby reversed. *Page 583 
 VI. Cain's Claim that the BHA was Negligently Performed
Cain pleaded that Dr. Howorth "negligently performed a bipolar endoprosthesis." She adequately fleshes out that claim in her initial brief to this Court by arguing that in performing the BHA, Dr. Howorth "reamed the acetabulum," and that the reaming was below the standard of care for that procedure. Dr. Howorth testified that, although he did not recall if he reamed Cain's left acetabulum, he usually did not do so in a BHA, although in that procedure, "minimal" reaming was sometimes done, "sav[ing] as much cartilage as possible." He normally either would not ream the acetabulum at all in performing a BHA, "or only very slightly on the peripheral ream so that the socket fit properly." He did not believe that, if he had reamed Cain's acetabulum, he would have reamed it so much that all of the cartilage would be gone or that the bipolar head he put in would have caused all of the cartilage to be gone within a year. Dr. Howorth felt that his entry in his operative report that he had performed "progressive acetabular reaming" was "incorrect."
Dr. Featheringill recorded in both his November 30, 1998, office note and his February 17, 1999, operative report that there was no cartilage present in Cain's left acetabulum. Dr. Nehmer stated in his affidavit that the standard of care attending the performance of a BHA "did not include reaming the acetabulum" and that if Dr. Howorth did so, "the reaming of the acetabulum would be below the standard of care." He asserted that reaming would normally be done only if there were arthritis and the procedure performed was a THA. Finally, Dr. Nehmer stated that "one of the known complications with the reaming of the acetabulum is that pain could be produced as a result of the reamed acetabulum." Cain claims to have experienced, and reported postoperatively to Dr. Howorth, continuing pain in her left hip. Reviewing this state of the record most favorably to Cain, we conclude that she established by substantial evidence genuine issues of material fact as to all elements of this particular claim, and the summary judgment as to it is, therefore, reversed.
 VII. Cain's Claim that the THA was Negligently Performed
Cain averred in her complaint that Dr. Howorth "negligently performed a left total hip arthroplasty," negligently, wantonly and/or intentionally failed to place or install an acetabulum component in connection with that procedure and negligently failed to detect the absence of that component. By his motion for a summary judgment and supporting materials, Dr. Howorth made a prima facie showing that the only procedure he intended or attempted to perform, and did perform, was a BHA. The burden then shifted to Cain, as far as this particular claim is concerned, to present substantial evidence indicating that Dr. Howorth attempted or performed incompletely a THA. Cain argued to the trial court, in her response to the motion for summary judgment, that Dr. Howorth had repeatedly described the procedure in his office and hospital dictations as a THA; had told her he would, and had, performed a THA; had stated in the hospital records that he used a "44 mm acetabulum component"; had recorded in his operative report that he performed progressive reaming of the acetabulum; and that Dr. Featheringill had found no acetabulum cartilage present.
As noted earlier, Cain summarizes this theory of malpractice in her initial brief by asserting that Dr. Howorth negligently, wantonly, and/or intentionally "failed to install an acetabulum component at the time *Page 584 
of Cain's left total hip arthroplasty." We find that Dr. Howorth fully explained in his deposition that in performing the BHA he used a swivel socket, whereby "you still have kind of a socket component. It's just called a bipolar head." He further explained that he did put in a 44-millimeter bipolar component that fit in the acetabulum. When asked if he had "put in an acetabulum component?," he explained, "It's not really [an] acetabulum component per se. It's a bipolar head component" that "fits into the acetabulum." Later, in referring to the fact that Dr. Howorth's operative report referred to the use of a 44-millimeter acetabulum component, counsel for Cain asked, "[I]s that [the] component we were talking about [describing the bipolar head]," and Dr. Howorth answered, "Correct."
Cain now proposes to us a sinister scenario, never argued to the trial judge, pursuant to which, because Dr. Howorth charges more for a THA than a BHA, and for billing purposes the hospital coded the procedure as a THA, he must have started a THA but then intentionally omitted the 44-millimeter acetabular component. She presents no expert testimony to support her theory that a THA was partially performed and her "showing" otherwise in that regard, in the face of Dr. Howorth's affidavit and testimony, does not constitute substantial evidence of an attempted, but incompletely performed, THA. The issue of fact created as to the claim of negligent performance of a BHA, relating to whether Dr. Howorth progressively and excessively reamed the acetabulum, does not supply substantial evidence supportive of the alternative theory that he reamed in furtherance of an attempted THA, but then abandoned that attempt and completed a BHA. The trial court did not err in entering a summary judgment in favor of Dr. Howorth as to Cain's claim that he had negligently or wantonly performed a THA.
 VIII. The Remaining Claims
None of the other claims pleaded by Cain have been brought forward in her briefs; they are therefore waived. Failure to argue an issue, with citation to applicable authority, is tantamount to a waiver of that issue on appeal. Ex parte Riley, 464 So.2d 92 (Ala. 1985).
 "'When an appellant fails to properly argue an issue, that issue is waived and will not be considered. Boshell v. Keith, 418 So.2d 89 (Ala. 1982).' Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App. 1996). `An appeals court will consider only those issues properly delineated as such, and no matter will be considered on appeal unless presented and argued in brief. Ex parte Riley, 464 So.2d 92 (Ala. 1985).' Braxton v. Stewart, 539 So.2d 284, 286 (Ala.Civ.App. 1988)."
Tucker v. Cullman-Jefferson Counties Gas Dist., [Ms. 1011530, May 9, 2003] 864 So.2d 317, 319 (Ala. 2003).
 Conclusion
For the reasons discussed above, we reverse the summary judgment for Dr. Howorth as to the claim of "lack of consent" for the BHA Dr. Howorth performed and as to the claim that he negligently performed that BHA, and we remand the case to the trial court for further proceedings consistent with this opinion. We affirm the summary judgment as to all of the other "claims." We note, however, that Cain's assertions that Dr. Howorth negligently caused, allowed, or permitted her to develop left trochanteric bursitis and gluteus medius "aurch" relate only to alleged injury and damage under the two surviving claims, if those claims are otherwise proven at trial and proximate causation established.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED. *Page 585 
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, and WOODALL, JJ., concur.
STUART, J., concurs in the result.
[1] Cain also sued various other medical entities, but the trial court entered a summary judgment in their favor and she does not appeal from it.
[2] The different, overlapping terminologies used to describe the two types of hip-replacement surgery — bipolar hip arthroplasty and total hip arthroplasty — are at issue in this case.
[3] The acetabulum is "the cup-shaped socket in the hipbone."Merriam-Webster's Collegiate Dictionary (11th ed. 2003).
[4] During her deposition, Cain was asked by counsel for Dr. Howorth about her allegation of "gluteus medius arch," and she responded that, "I walk with a limp, a lurch limp like." (Emphasis supplied.) Dr. Howorth recorded in his June 26, 1998, office note that Cain "walks with a gluteus medius lurch."
[5] See note 4.
[6] This, and all Cain's other deposition testimony, was before the trial judge without objection. Apparently no deposition or affidavit was obtained from Dr. Featheringill, and his views are presented only by way of Cain's recounting of them and the medical records authored by him.