Dr. Clifford Black, a defendant in a case in the Calhoun Circuit Court, appeals from a summary judgment in favor of Holley Lynn Comer, his former patient and the plaintiff below. After Dr. Black performed a laparotomy on Comer, Comer sued Dr. Black, stating claims based on several theories, including battery and, as eventually framed by the parties, a failure to obtain consent. The claims related to Dr. Black's surgical removal from Comer's abdomen of a tissue mass that turned out to be a kidney. The trial court held that Dr. Black was liable as a matter of law on the battery and failure-to-obtain-consent claims, and a jury subsequently awarded Comer compensatory damages. We reverse and remand for a new trial.
 Facts
Viewing the facts in the light most favorable to the nonmovant, Dr. Black, as we must in compliance with our standard of review of a summary judgment, Hanners v. Balfour Guthrie, Inc.,564 So.2d 412, 413 (Ala. 1990), we find the following facts to have been established by substantial evidence:
In early 1995 Comer, who was then 40 years old, sought treatment from his primary-care physician for night sweats, weight loss, and "late day" fevers. Additionally, he had recently experienced an axillary (armpit) vein thrombosis. Comer's clinical presentation placed a diagnosis of lymphoma (a tumor of the lymph nodes) high on the index of suspicion. His primary-care physician ordered a CT scan of Comer's abdomen. The radiologist interpreting the scan reported a small calcification in the left posterior lung and some thickening of the bowel, but identified no other abnormalities. The radiologist's report noted that "[t]he kidneys are excreting contrast well without evidence of hydronephrosis or renal mass."
Comer's primary-care physician referred Comer to Dr. Black, a board-certified general surgeon, for a colonoscopy. Dr. Black performed the colonoscopy and found nothing to explain Comer's symptoms. Because those symptoms continued to suggest a lymphoma or at least some type of hidden tumor, Dr. Black recommended a diagnostic abdominal laparoscopy, a procedure in which the doctor views the abdominal cavity through a laparoscope, an optical surgical instrument inserted through a small cut in or near the patient's navel. If Dr. Black could not adequately evaluate Comer's condition using the laparoscope, he wanted to convert the procedure to an exploratory laparotomy, a procedure in which the surgeon opens the patient's abdomen. He explained both procedures to Comer. Dr. Black told Comer that he might "have to remove tissue in order to make a diagnosis or to treat what [he] found" and that he might have to "do some procedure . . . appropriate for what he found." Dr. Black also discussed with Comer "that it might become necessary to remove abnormal tissue depending upon the findings of the laparoscopy and possible laparotomy [and] Comer did consent to the removal of abnormal tissue which could be the cause of his symptoms."
Comer was admitted to Northeast Alabama Regional Medical Center on May 18, 1995. He authorized Dr. Black to perform the procedures by signing a consent form that read, in pertinent part: *Page 1086 
 "I hereby authorize Dr. Clifford Black and whomsoever he . . . may designate as assistant to perform upon myself . . . [a] Diagnostic Laparoscopy[,] possible open Laparotomy [,] and such additional operations/procedures during the course of the above as are considered therapeutically necessary or advisable in the exercise of professional judgment.
 "The nature and purpose of the operation/procedure, the reason it is considered necessary, the possible risks involved, the possibility of complications and alternative methods of treatment have been fully explained to me and to my satisfaction by my physician or his designee.
". . . .
 "I further acknowledge that no guarantees have been made to me concerning the results of the operation/procedure.
 "I authorize the above named physician to provide such additional services as deemed reasonable and necessary according to medical judgment including, but not limited to, the services of pathology and radiology and the administration and maintenance of anesthesia with the exception of none.
 "I authorize the hospital to retain or dispose of any tissue or parts in accordance with the customary practice of the hospital.
". . . .
 "I have read or have had read to me the above statements and agree with all except none."
Comer's signing of the consent form was witnessed by a nurse and by Rebecca Comer, Comer's wife. Comer does not challenge in any way the validity or enforceability of the written consent; rather, he simply argues that Dr. Black's actions exceeded the scope of his consent and that the written consent "should be interpreted by the court like any other contract" to determine its scope. (Comer's brief, p. 32.)
During the laparoscopy, Dr. Black discovered "a hard-feeling tissue" in Comer's retroperitoneum — the space between the lining of the abdominal and pelvic cavities and the muscles and bones of the posterior abdominal wall. He could not see this tissue with the laparoscope because his view of the area in which the tissue lay was blocked by the lining and by a layer of fatty tissue. Dr. Black elected to convert the procedure to an open laparotomy.
When Dr. Black palpated the retroperitoneum through the surgical opening, he felt Comer's right kidney and what he believed to be the left kidney. He also palpated the hard-feeling tissue mass he had detected using the laparoscope, positioned below hip level, all the way in the back of the abdomen; it was sitting at the mid-line on the lowest part of the vertebral column before the spine curves into the pelvis. The mass was located about 10 inches away from where a kidney normally would be situated. It was composed of several hard lobes and was quite a bit smaller than a normal kidney. Dr. Black surgically entered the retroperitoneum to further examine the mass. Because it was encased in fatty tissue he could not see it clearly, but nothing he could see suggested to him that the mass was a kidney. The vasculature usually present to serve a normally placed kidney was not present.
Dr. Black believed the irregular mass to be matted together lymph nodes, characteristic of lymphoma and other tumors. The location of the mass was typical for lymph nodes and atypical for a kidney. Dr. Black did not consider that the mass might be an ectopic (misplaced) kidney because he believed that he had located both kidneys while he was palpating the organs. Furthermore, before surgery Dr. *Page 1087 
Black had reviewed the radiologist's report of the CT scan, which described two normally excreting kidneys and did not note any unusual placement of a kidney.
Because Dr. Black did not know the vascular composition of the mass, he had to consider whether taking a small portion of it to send to pathology might cause uncontrollable bleeding. Also, he was concerned that if he took a small portion for analysis and it was malignant, he would run the risk of seeding the abdomen with cancer cells and possibly introducing cancer to other sites. Consequently, Dr. Black elected to remove the entire mass. After he had done so, he cut a sample from the mass and sent it to the hospital's pathology department for identification. About 15 minutes later the pathology department reported that the sample seemed to be kidney tissue. The remainder of the mass was submitted to pathology, and the excised mass was ultimately determined to be a 74-gram kidney with a short segment of ureter attached. According to Dr. Black, a normal kidney weighs 175 grams. Dr. Black later testified that had he realized during the surgical procedure that the mass was an ectopic kidney, he would not have removed it without first consulting with a urologist. After getting the initial report from pathology, Dr. Black closed Comer's surgical incision and sent him to recovery.
Soon after surgery, Dr. Black retrieved and reviewed the film of the CT scan that had been taken of Comer's abdomen. On the scan he could see an enlarged but otherwise normal right kidney with a normal excreting system and a small, multilobulated kidney with a dual collecting system near Comer's mid-line. Dr. Black subsequently advised Comer and his family that the tissue he removed was not a lymphoma or a tumor; rather, it was a small kidney found outside its normal location. He explained that it was located in an area where he would expect a tumor to be located and that while the CT scan showed the small, ectopic kidney, the radiologist's report that interpreted the scan did not reference any abnormality.
On the evening of the day of surgery, Comer began having trouble breathing and started experiencing severe pain. His stomach started swelling, and his red blood-cell count dropped. He was returned to surgery, where it was discovered that he was bleeding from two small arteries in the area where the ectopic kidney had been removed. The bleeding was stopped, and there were no other post-surgical complications. In the weeks and months following the surgery, Comer gained weight, and the other symptoms that had led him to seek treatment from Dr. Black disappeared.
On February 14, 1997, Comer sued the radiologist who interpreted the CT scan, Dr. Black, and their fictitiously named employers, alleging the "wrongful taking" of his left kidney. The radiologist and the fictitiously named employers were later dismissed from the action. Comer asserted that Dr. Black had been negligent in various specified respects including "failing to obtain consent." Comer also asserted a claim against Dr. Black of "[b]attery in removing a viable organ without Comer's consent." Dr. Black answered the complaint, denying liability to Comer on any of the advanced theories.
On September 9, 2003, Comer filed a motion requesting a partial summary judgment against Dr. Black as to liability on the failure-to-obtain-consent and battery claims.[1] Filed in support of the motion *Page 1088 
were excerpts from Comer's medical records and excerpts from his and Dr. Black's depositions. Dr. Black filed an opposition to the motion, supporting it with additional excerpts from Comer's medical records, excerpts from Comer's deposition, and Dr. Black's entire deposition.
On January 22, 2004, the trial court granted Comer's motion for a partial summary judgment. Its order stated, in pertinent part:
 "Upon consideration of [Comer's] Motion for Partial Summary Judgment and [Dr. Black's] response thereto, this Court finds that there is no dispute as to any material issue of fact on [Comer's] claims of failure of informed consent and battery and [Comer] is therefore entitled to a judgment as a matter of law on said claims.
 "It is therefore ORDERED, ADJUDGED and DECREED that judgment is entered in favor of [Comer] and against the Defendant, Clifford P. Black, M.D. on [Comer's] claims of failure of informed consent and battery. The issue of damages shall be determined by a duly impaneled jury on May 3, 2004."[2]
Dr. Black filed a motion to alter, amend, or vacate the judgment, or, in the alternative, to certify the judgment as final for purposes of appeal. The record does not reflect that the court ever ruled on his motion.
At some point Comer had voluntarily dismissed all his other claims against Dr. Black, thereby giving the court's partial summary judgment the effect of a final summary judgment on the issue of liability. The case proceeded to trial solely on the issue of damages. On May 4, 2004, the jury awarded Comer compensatory damages of $150,000 — $100,000 for Comer's past pain and suffering and mental anguish and $50,000 for his future mental anguish. The court entered a judgment on the jury's verdict. Dr. Black filed a motion to alter, amend, or vacate the judgment and to enter judgment in his favor, or, in the alternative, for a new trial, arguing that the evidence was uncontroverted that he had Comer's consent to remove during surgery any tissue Dr. Black believed to be abnormal. The trial court did not rule on Dr. Black's postjudgment motion, and under Rule 59.1, Ala. R. Civ. P., that motion was deemed denied by operation of law on August 31, 2004. Dr. Black timely filed a notice of appeal to this Court.
 Standard of Review
Our review of a summary judgment is de novo. Given the procedural *Page 1089 
posture of this case, our review is subject to all of the following principles.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542
(Ala. 1995); Rule 56(c), Ala. R. Civ. P."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
 "On a motion for summary judgment, the burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact to be considered by the jury. When the moving party has made this prima facie showing, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Leonard v. Providence Hosp., 590 So.2d 906, 907 (Ala. 1991). `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). See § 6-5-542(5), Ala. Code 1975; Gonzalez v. Blue Cross/Blue Shield of Alabama, 689 So.2d 812, 816 (Ala. 1997)."
Wells v. Storey, 792 So.2d 1034, 1040-41 (Ala. 1999).
When a court evaluates the propriety of summary judgment, "`[a]n issue [of material fact] is genuine if reasonable persons could disagree.'" Brigman v. Dejute, 593 So.2d 51, 53 (Ala. 1991) (quoting William N. Schwarzer, Summary Judgment Under theFederal Rules: Defining Genuine Issues of Material Fact,99 F.R.D. 465, 481 (1982)).
 "When ruling on a motion for summary judgment, the court should consider all evidence of record, including that evidence formally submitted in support of, or in opposition to, the motion. Speigle v. Lott, 423 So.2d 163 (Ala. 1982). Since the burden of proof is initially on the moving party, evidence received by the trial court should be construed most strongly in favor of the opposing party, and that party should be given the benefit of all favorable inferences that can be drawn from the evidence. Ryan v. Charles Townsend Ford, Inc., 409 So.2d 784 (Ala. 1981). In addition, when reviewing the propriety of a summary judgment, this Court must view the motion and the evidence in a light most favorable to the opposing party. Turner v. Systems Fuel, Inc., 475 So.2d 539 (Ala. 1985)."
Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278, 1280 (Ala. 1991).
"In reviewing the trial court's decision [to enter a summary judgment], an appellate court is limited to those factors and that evidence considered by the trial court." Walker v.Community Bank, 596 So.2d 886, 887 (Ala. 1992) (citation omitted). "The propriety of a summary judgment must be tested by reviewing what the trial court had before it when it entered the judgment. Willis v. Ideal Basic Indus., Inc., 484 So.2d 444
(Ala. 1986)." Greene v. Thompson, 554 So.2d 376, 379 (Ala. 1989). See, also, Serra Chevrolet, Inc. v. Edwards Chevrolet,Inc., 850 So.2d 259, 265 (Ala. 2002); Bean v. State Farm Fire Cas. Co., 591 So.2d 17, 20 (Ala. 1991).
 "`On a motion for an offensive summary judgment, that is, one on behalf of the plaintiff, the plaintiff must conclusively prove every element of his claim.' *Page 1090 
"Ramsay v. Grove Hill Mem'l Hosp. Auxiliary, 829 So.2d [142,] 144-45 [(Ala.Civ.App. 2002)]."
Ex parte Ramsay, 829 So.2d 146, 153 (Ala. 2002).
 Law and Analysis
Comer made the following argument concerning the issue of consent in his motion for a partial summary judgment:
 "[Comer] agreed to the removal of a tumor. It is undisputed that no tumor was found at the time of the surgery or since. The fact that Dr. Black negligently failed to identify an organ before removing it, does not then extend consent to the wrongful removal of an organ, simply because Dr. Black failed to identify the known part of the body, and mistook the kidney for a tumor. . . ."
In opposition to Comer's motion for a partial summary judgment, Dr. Black made the following argument concerning the scope of the consent given by Comer:
 "Dr. Black had [Comer's] consent to perform the open laparotomy, to perform `such additional operations/procedures during the course of the above as are considered therapeutically necessary or advisable in the exercise of professional judgment' [and][']to provide such additional services as deemed reasonable and necessary according to medical judgment' and to remove tissue that Dr. Black believed to be abnormal or cancerous. At the very least, viewing the evidence in the light most favorable to Dr. Black, genuine issues of material fact exist as to whether Dr. Black had [Comer's] consent to remove the ectopic kidney which he believed to be abnormal tissue that was possibly cancerous."
As demonstrated by the arguments the parties made to the trial court, there is a dispute in this case as to the parameters of the consent Comer gave Dr. Black for the operation.
Comer argues that a medical consent is essentially contractual in nature and should be interpreted like any other contract and enforced according to its terms. He goes on to state:
 "In this case, the contract is not ambiguous. The parties disagree about the proper construction of the phrase, `such additional procedures during the course of the above as are considered therapeutically necessary,' but the phrase is not thereby rendered ambiguous."
(Comer's brief, pp. 36-37.)
Dr. Black does not disagree that the general rules of contract construction should apply, but he insists that the consent should be enforced "as written." He argues that, as written, the consent authorized him to exercise his professional judgment in determining whether tissue should be removed and that the broad authorization given was sufficient to allow him to remove tissue he believed, in the exercise of his professional judgment, to represent abnormal lymph nodes. Comer responds that it must be presumed that the parties intended to make a reasonable contract and that Dr. Black's interpretation would render the consent unreasonable by making it "unlimited." As Comer understands Dr. Black's interpretation of the contract:
 "[T]he phrase `such additional procedures during the course of the above as are considered therapeutically necessary,' means that Dr. Black would be within the scope of the consent even if he had mistakenly removed one of Comer's arms. This result is absurd and demonstrates that the construction of the contract urged by Dr. Black is not reasonable. No matter how much Comer may have trusted Dr. Black, he only authorized him to remove lymphomas or *Page 1091 
abnormal tissue. Dr. Black's interpretation of the consent would mean that any consent which allows the doctor to use his medical judgment would be unlimited."
(Comer's brief, p. 38.)
For his part, Dr. Black insists that Comer is trying to rewrite the consent to say that he consented to Dr. Black's performing additional operations and procedures he deemed necessary or advisable in the exercise of his professional judgment, but only if Dr. Black was not mistaken in the exercise of that judgment. Dr. Black argues that, by its very nature, the term "judgment," and particularly "professional judgment," references a process that is not infallible but is subject to being proven, after the fact, not to have been correct.
Thus, the pivotal issue in the trial court and on appeal is the scope of the consent. We agree with Dr. Black that the language of the consent does not say that he had the authority to perform only those additional operations or procedures that were in fact therapeutically necessary or advisable; rather, the consent permitted Dr. Black to perform additional operations and procedures he considered therapeutically necessary or advisablein the exercise of his professional judgment. Comer understood that neither the laparoscopy nor the potential laparotomy was intended to target a particular organ or to accomplish a particular therapeutic result; the procedures were "diagnostic" and exploratory in nature and could involve the removal of tissue, depending upon Dr. Black's findings during the procedures. Comer's consent was broad and essentially "open-ended," qualified and conditioned only by the limitation that any additional operations or procedures Dr. Black might perform must be those "considered therapeutically necessary or advisable in the exercise of professional judgment." Such an authorization does not represent unlimited "carte blanche," however; it applies only to those operations and procedures that might be considered therapeutically necessary or advisable in the exercise of professional judgment. This language did not authorize Dr. Black to act in whatever fashion he might subjectively think appropriate in the exercise of his professional judgment, regardless of how medically aberrant that judgment might be. Rather, this language authorized only additional operations and procedures considered therapeutically necessary or advisable under the objective standard of care that controls the exercise of professional judgment.
 "Initially, we note that the legislature has codified the standard of care to be exercised by physicians in this state. [Ala.] Code 1975, § 6-5-484, provides as follows:
 "`(a) In performing professional services for a patient, a physician's, surgeon's, or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community.
 "`(b) Neither a physician, a surgeon, a dentist nor a hospital shall be considered an insurer of the successful issue of treatment or service.'"
Shumaker v. Johnson, 571 So.2d 991, 993 (Ala. 1990) (declaring jury charge in a medical-malpractice case that a physician is not liable "for an honest mistake or an honest error or judgment" to be reversible error because § 6-5-484 "clearly states an objective *Page 1092 
standard for the performance of professional duties by physicians").
Dr. Black explained in his deposition testimony the convergence of signs, symptoms, diagnostic possibilities, intraoperative findings, and the therapeutic options available under the circumstances that caused him to consider the course of conduct he took to be therapeutically necessary or advisable in the exercise of his professional judgment.
 "(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."
Ala. Code 1975, § 6-5-548.
When the trial judge entered the partial summary judgment in favor of Comer, concluding that Dr. Black did not have medically and legally efficacious consent to remove the tissue mass ultimately determined to be a kidney, it had been neither proven nor disproven that Dr. Black had exercised that level of reasonable care, skill, and diligence as another board-certified surgeon would have exercised in a like case, given all of the facts then available to Dr. Black. Whether Dr. Black failed to satisfy the "relative standard of care" in that regard (§6-5-548(e), Ala. Code 1975) requires proof, one way or the other, by expert testimony. It could not be resolved merely on the basis of a lay understanding, which requires only common knowledge and experience. See Ex parte HealthSouth Corp., 851 So.2d 33 (Ala. 2002). Thus, a genuine issue of material fact existed in that regard, precluding a summary judgment on the issue of liability.
In a footnote in his brief to this Court, Dr. Black argues:
 "[Comer] and the trial court treated lack of consent and battery as separate claims . . . but the historical basis for a claim based upon lack of consent is battery. See, e.g., [Donald v. Swann], 24 Ala.App. 463, 465, 137 So. 178 (1931) (`It is laid down as a general rule, and supported by unquestioned authority, that every human being of adult years and sound mind has a right to determine what shall be done with his own body, and any operation performed, even by a surgeon acting in good faith, which is done without the consent and over the protest of the party operated on, is an assault and battery for which an action will lie.'); Fain v. Smith, 479 So.2d 1150, 1157-58 (Ala. 1985) (Jones, J., dissenting) (reviewing the historical development of claims for lack of consent and failure of informed consent). A claim that a physician treated a patient without consent is a claim for battery. See, e.g., Duncan v. Scottsdale Medical Imaging, Ltd., 205 Ariz. 306, 310, 70 P.3d 435, 439 (2003) (recognizing the distinction between lack of consent cases, which should be pled as battery claims, and lack of informed consent cases, which should be pled as negligence claims); Cobbs v. Grant, 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1, 8 (1972) (same). Many courts refer to claims for lack of consent as `medical battery' claims. See, e.g., Haile v. Sutherland, 598 N.W.2d 424, 428 (Minn.App. 1999) (noting that `medical battery cases' are limited to substantial and obvious deviations from the anticipated procedure or treatment); Lounsbury v. Capel, 836 P.2d 188, 195 (Utah App. 1992) (`A typical medical battery case is that of a patient who consents to a particular procedure, *Page 1093 
but who receives treatment different from that which was authorized')."
(Dr. Black's brief, p. 21 n. 3.)
Responding, likewise by way of a footnote in his appellate brief, Comer advises that he will use the term "battery" to encompass both his lack-of-consent and battery claims; he acknowledges that he originally treated them as separate claims, but he now agrees with Dr. Black, referencing the above-quoted footnote from Dr. Black's brief, that a claim that a physician treated a patient without consent is a claim alleging battery.
Because of our determination and disposition of the "consent" issue, we adopt the parties' approach; we do not attempt to distinguish between a claim of lack of consent and a claim of battery, "medical" or otherwise. In so collapsing the lack-of-consent claim and the battery claim for purposes of our analysis of the pivotal feature of consent, we are mindful that the further presentation of the claim or claims will be "governed by the Alabama Medical Liability Act of Alabama 1987 [§ 6-5-540
et seq., Ala. Code 1975]." Cain v. Howorth, 877 So.2d 566, 581
(Ala. 2003). The definition of "standard of care" set forth by §6-5-542(2), Ala. Code 1975, "governs all actions against the health-care providers specified in the [Alabama Medical Liability Act of 1987]." Collins v. Ashurst, 821 So.2d 173, 176 (Ala. 2001).
We reverse the summary judgment and the judgment entered following the trial on the damages and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.
[1] Although Comer stated in the motion that he sought a summary judgment "as to liability on his claims for failure ofinformed consent and battery" (emphasis supplied) and although Dr. Black's opposition to the motion addressed, in pertinent part, the cause of action arising out of performing a medical procedure without obtaining informed consent from the patient, the parties subsequently converted the claim to one asserting simply a lack of consent. Specifically, Comer filed a response to Dr. Black's opposition in which Comer explained that after he had filed his motion, this Court issued its opinion in Cain v.Howorth, 877 So.2d 566 (Ala. 2003), distinguishing between a claim of a lack of consent to the performance of a medical procedure and a claim of a "lack of informed consent." Comer advised that the claim he had pleaded as "negligence in failing to obtain consent" should now be understood as one "alleg[ing] failure to obtain consent (rather than informed consent)." Dr. Black accepted that recasting of the claim, characterizing the claim in his subsequent submission to the trial court as one of "lack of consent," and he does likewise throughout his briefs to this Court. Accordingly, we address only a claim of lack of consent, as opposed to a claim of lack of informed consent.
[2] Although the trial court's order refers to a claim of "failure of informed consent," the parties clearly abandoned a claim of lack of informed consent, proceeding solely on a claim of lack of consent. See note 1.