SMITH, Justice.
 

 Clifford P. Black, M.D., appeals from a judgment entered against him in an action filed by Holley Lynn Comer. We affirm.
 

 Facts and Procedural History
 

 This case has previously been before this Court.
 
 See Black v. Comer,
 
 920 So.2d 1083 (Ala.2005)
 
 (“Black I
 
 ”). The following factual background from
 
 Black I
 
 is relevant to this appeal:
 

 “In early 1995 Comer, who was then 40 years old, sought treatment from his primary-care physician for night sweats, weight loss, and ‘late day’ fevers. Additionally, he had recently experienced an axillary (armpit) vein thrombosis. Comer’s clinical presentation placed a diagnosis of lymphoma (a tumor of the lymph nodes) high on the index of suspicion. His primary-care physician ordered a CT scan of Comer’s abdomen ....
 

 “Comer’s primary-care physician referred Comer to Dr. Black, a board-certified general surgeon, for a colonos-copy. Dr. Black performed the colo-noscopy and found nothing to explain Comer’s symptoms. Because those symptoms continued to suggest a lymphoma or at least some type of hidden tumor, Dr. Black recommended a diagnostic abdominal laparoscopy, a procedure in which the doctor views the abdominal cavity through a laparoscope, an optical surgical instrument inserted through a small cut in or near the patient’s navel. If Dr. Black could not adequately evaluate Comer’s condition using the laparoscope, he wanted to convert the procedure to an exploratory laparotomy, a procedure in which the surgeon opens the patient’s abdomen. He explained both procedures to Comer. Dr. Black told Comer that he might ‘have to remove tissue in order to make a diagnosis or to treat what [he] found’ and that he might have to ‘do some procedure ... appropriate for what he found.’ Dr. Black also discussed with Comer ‘that it might become necessary to remove abnormal tissue depending upon the findings of the laparoscopy and possible laparotomy [and] Comer did consent to the removal of abnormal tissue which could be the cause of his symptoms.’
 

 “Comer was admitted to Northeast Alabama Regional Medical Center on May 18, 1995. He authorized Dr. Black to perform the procedures by signing a consent form that read, in pertinent part:
 

 “ T hereby authorize Dr. Clifford Black and whomsoever he ... may designate as assistant to perform upon myself ... [a] Diagnostic Lapar-oscopy[,] possible open Laparotomy [,] and such additional operations/ procedures during the course of the above as are considered therapeutically necessary or advisable in the exercise of professional judgment.
 

 
 *18
 
 “ ‘The nature and purpose of the operation/procedure, the reason it is considered necessary, the possible risks involved, the possibility of complications and alternative methods of treatment have been fully explained to me and to my satisfaction by my physician or his designee.
 

 [[Image here]]
 

 “ T further acknowledge that no guarantees have been made to me concerning the results of the operation/procedure.
 

 “ T authorize the above named physician to provide such additional services as deemed reasonable and necessary according to medical judgment including, but not limited to, the services of pathology and radiology and the administration and maintenance of anesthesia with the exception of none. “ T authorize the hospital to retain or dispose of any tissue or parts in accordance with the customary practice of the hospital.
 

 [[Image here]]
 

 “ T have read or have had read to me the above statements and agree with all except none.’
 

 “Comer’s signing of the consent form was witnessed by a nurse and by Rebecca Comer, Comer’s wife. Comer does not challenge in any way the validity or enforceability of the written consent; rather, he simply argues that Dr. Black’s actions exceeded the scope of his consent and that the written consent ‘should be interpreted by the court like any other contract’ to determine its scope. (Comer’s brief, p. 32.)
 

 “During the laparoscopy, Dr. Black discovered ‘a hard-feeling tissue’ in Comer’s retroperitoneum — -the space between the lining of the abdominal and pelvic cavities and the muscles and bones of the posterior abdominal wall. He could not see this tissue with the laparoscope because his view of the area in which the tissue lay was blocked by the lining and by a layer of fatty tissue. Dr. Black elected to convert the procedure to an open laparotomy.
 

 “When Dr. Black palpated the retro-peritoneum through the surgical opening, he felt Comer’s right kidney and what he believed to be the left kidney. He also palpated the hard-feeling tissue mass he had detected using the laparo-scope, positioned below hip level, all the way in the back of the abdomen; it was sitting at the mid-line on the lowest part of the vertebral column before the spine curves into the pelvis. The mass was located about 10 inches away from where a kidney normally would be situated. It was composed of several hard lobes and was quite a bit smaller than a normal kidney. Dr. Black surgically entered the retroperitoneum to further examine the mass. Because it was encased in fatty tissue he could not see it clearly, but nothing he could see suggested to him that the mass was a kidney. The vasculature usually present to serve a normally placed kidney was not present.
 

 “Dr. Black believed the irregular mass to be matted together lymph nodes, characteristic of lymphoma and other tumors. The location of the mass was typical for lymph nodes and atypical for a kidney. Dr. Black did not consider that the mass might be an ectopic (misplaced) kidney because he believed that he had located both kidneys while he was palpating the organs....
 

 “Because Dr. Black did not know the vascular composition of the mass, he had to consider whether taking a small portion of it to send to pathology might cause uncontrollable bleeding. Also, he was concerned that if he took a small
 
 *19
 
 portion for analysis and it was malignant, he would run the risk of seeding the abdomen with cancer cells and possibly introducing cancer to other sites. Consequently, Dr. Black elected to remove the entire mass. After he had done so, he cut a sample from the mass and sent it to the hospital’s pathology department for identification. About 15 minutes later the pathology department reported that the sample seemed to be kidney tissue. The remainder of the mass was submitted to pathology, and the excised mass was ultimately determined to be a 74-gram kidney with a short segment of ureter attached. According to Dr. Black, a normal kidney weighs 175 grams. Dr. Black later testified that had he realized during the surgical procedure that the mass was an ectopic kidney, he would not have removed it without first consulting with a urologist. After getting the initial report from pathology, Dr. Black closed Comer’s surgical incision and sent him to recovery.
 

 [[Image here]]
 

 “On the evening of the day of surgery, Comer began having trouble breathing and started experiencing severe pain. His stomach started swelling, and his red blood-cell count dropped. He was returned to surgery, where it was discovered that he was bleeding from two small arteries in the area where the ectopic kidney had been removed. The bleeding was stopped, and there were no other postsurgical complications. In the weeks and months following the surgery, Comer gained weight, and the other symptoms that had led him to seek treatment from Dr. Black disappeared.
 

 “On February 14, 1997, Comer sued ... Dr. Black, ... alleging the ‘wrongful taking’ of his left kidney. Comer asserted that Dr. Black had been negligent in various specified respects including ‘failing to obtain consent.’ Comer also asserted a claim against Dr. Black of ‘[b]attery in removing a viable organ without Comer’s consent.’ Dr. Black answered the complaint, denying liability to Comer on any of the advanced theories.
 

 “On September 9, 2003, Comer filed a motion requesting a partial summary judgment against Dr. Black as to liability on the failure-to-obtain-consent and battery claims.
 
 [1]
 

 920 So.2d at 1084-88.
 

 The trial court in
 
 Black I
 
 entered a partial summary judgment in favor of Comer on his lack-of-consent claim. Comer later voluntarily dismissed his remaining claims against Dr. Black, “thereby giving the court’s partial summary judgment the effect of a final summary judgment on the issue of liability.” 920 So.2d at 1088.
 
 *20
 
 The issue of damages was tried before a jury; “the jury awarded Comer compensatory damages of $150,000 — $100,000 for Comer’s past pain and suffering and mental anguish and $50,000 for his future mental anguish.” 920 So.2d at 1088.
 

 This Court in
 
 Black I
 
 reversed the judgment entered on that jury verdict. We noted the following arguments of the parties:
 

 “Comer made the following argument concerning the issue of consent in his motion for a partial summary judgment:
 

 “ ‘[Comer] agreed to the removal of a tumor. It is undisputed that no tumor was found at the time of the surgery or since. The fact that Dr. Black negligently failed to identify an organ before removing it, does not then extend consent to the wrongful removal of an organ, simply because Dr. Black failed to identify the known part of the body, and mistook the kidney for a tumor....’
 

 “In opposition to Comer’s motion for a partial summary judgment, Dr. Black made the following argument concerning the scope of the consent given by Comer:
 

 “ ‘Dr. Black had [Comer’s] consent to perform the open laparotomy, to perform “such additional operations/procedures during the course of the above as are considered therapeutically necessary or advisable in the exercise of professional judgment” [and][“]to provide such additional services as deemed reasonable and necessary according to medical judgment” and to remove tissue that Dr. Black believed to be abnormal or cancerous. At the very least, viewing the evidence in the light most favorable to Dr. Black, genuine issues of material fact exist as to whether Dr. Black had [Comer’s] consent to remove the ectopic kidney which he believed to be abnormal tissue that was possibly cancerous.’ ”
 

 920 So.2d at 1090.
 

 We then stated:
 

 “As demonstrated by the arguments the parties made to the trial court, there is a dispute in this case as to the parameters of the consent Comer gave Dr. Black for the operation.
 

 [[Image here]]
 

 “... [T]he pivotal issue in the trial court and on appeal is the scope of the consent. We agree with Dr. Black that the language of the consent does not say that he had the authority to perform only those additional operations or procedures that were in fact therapeutically necessary or advisable; rather, the consent permitted Dr. Black to perform additional operations and procedures he
 
 considered
 
 therapeutically necessary or advisable
 
 in the exercise of his professional judgment.
 
 Comer understood that neither the laparoscopy nor the potential laparotomy was intended to target a particular organ or to accomplish a particular therapeutic result; the procedures were ‘diagnostic’ and exploratory in nature and could involve the removal of tissue, depending upon Dr. Black’s findings during the procedures. Comer’s consent was broad and essentially ‘open-ended,’ qualified and conditioned only by the limitation that any additional operations or procedures Dr. Black might perform must be those ‘considered therapeutically necessary or advisable in the exercise of professional judgment.’ Such an authorization does not represent unlimited ‘carte blanche,’ however; it applies only to those operations and procedures that might be considered therapeutically necessary or advisable in the exercise of professional judgment. This language did not authorize
 
 *21
 
 Dr. Black to act in whatever fashion he might subjectively think appropriate in the exercise of his professional judgment, regardless of how medically aberrant that judgment might be. Rather, this language authorized only additional operations and procedures considered therapeutically necessary or advisable under the objective standard of care that controls the exercise of professional judgment.
 

 “ ‘Initially, we note that the legislature has codified the standard of care to be exercised by physicians in this state. [Ala.] Code 1975, § 6-5-484, provides as follows:
 

 “ ‘ “(a) In performing professional services for a patient, a physician’s, surgeon’s, or dentist’s duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community.
 

 “ ‘ “(b) Neither a physician, a surgeon, a dentist nor a hospital shall be considered an insurer of the successful issue of treatment or service.” ’
 

 “Shumaker v. Johnson,
 
 571 So.2d 991, 998 (Ala.1990) (declaring jury charge in a medical-malpractice case that a physician is not hable ‘for an honest mistake or an honest error or judgment’ to be reversible error because § 6-5-484 ‘clearly states an objective standard for the performance of professional duties by physicians’).
 

 “Dr. Black explained in his deposition testimony the convergence of signs, symptoms, diagnostic possibilities, in-traoperative findings, and the therapeutic options available under the circumstances that caused him to consider the course of conduct he took to be therapeutically necessary or advisable in the exercise of his professional judgment.
 

 “ ‘(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.’
 

 “Ala.Code 1975, § 6-5-548.
 

 “When the trial judge entered the partial summary judgment in favor of Comer, concluding that Dr. Black did not have medically and legally efficacious consent to remove the tissue mass ultimately determined to be a kidney, it had been neither proven nor disproven that Dr. Black had exercised that level of reasonable care, skill, and diligence as another board-certified surgeon would have exercised in a like case, given all of the facts then available to Dr. Black. Whether Dr. Black failed to satisfy the ‘relative standard of care’ in that regard (§ 6-5-548(e), Ala.Code 1975) requires proof, one way or the other, by expert testimony. It could not be resolved merely on the basis of a lay understanding, which requires only common knowledge and experience. See
 
 Ex parte HealthSouth Corp.,
 
 851 So.2d 83 (Ala. 2002). Thus, a genuine issue of material fact existed in that regard, precluding a summary judgment on the issue of liability.”
 

 920 So.2d at 1090-92.
 

 On remand, Dr. Black moved for a summary judgment. At the hearing on that
 
 *22
 
 motion, the trial court indicated it would deny the motion. No order was entered on the motion, however, and the case ultimately was tried before a jury. At trial, Dr. Black moved for a judgment as a matter of law (“JML”) at the close of Comer’s case-in-chief and again at the conclusion of all the evidence. The trial court denied both motions, and the jury returned a verdict in Comer’s favor, awarding him $350,000 in compensatory damages, including damages for mental anguish. The trial court entered a judgment on that verdict.
 

 Dr. Black filed a renewed motion for a JML or, alternatively, for a new trial. Dr. Black argued, among other things, that Comer had not offered expert testimony indicating that Dr. Black had exceeded the scope of the consent. Alternatively, Dr. Black moved for a remittitur of the damages award. The trial court denied Dr. Black’s postjudgment motion, and Dr. Black appeals.
 

 Standard of Review
 

 “We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is ‘indistinguishable from the standard by which we review a summary judgment.’
 
 Hathcock v. Wood,
 
 815 So.2d 502, 506 (Ala.2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination.
 
 City of Birmingham v. Sutherland,
 
 834 So.2d 755 (Ala.2002). In
 
 Fleetwood Enters., Inc. v. Hutcheson,
 
 791 So.2d 920, 923 (Ala.2000), this Court stated that ‘ “[substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ 791 So.2d at 923 (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)).”
 

 Alabama Power Co. v. Aldridge,
 
 854 So.2d 554, 560 (Ala.2002).
 

 Discussion
 

 Dr. Black argues first that he was entitled to a JML. In support of that argument, Dr. Black contends that “[t]he only issue before the Court in
 
 Black I
 
 was the propriety of the judgment on the consent/battery claim and the only issue properly before the court on retrial was the consent claim.” He contends that
 

 “the only breach of the standard of care that was properly at issue on remand in this case was Dr. Black’s alleged breach related to the consent — that is, whether Dr. Black breached the standard of care in determining, in his professional judgment and based on the information then available to him, that removal of the mass was therapeutically necessary or advisable. The only breach of the standard of care that would support [Comer’s] lack of consent claim was a breach by Dr. Black in determining, in his professional judgment, that removal of the mass was therapeutically necessary or advisable, and [Comer] was required to offer expert testimony as to that specific breach to meet his burden of proof.
 
 Black I,
 
 920 So.2d at 1092. The expert testimony had to be specifically tailored to that particular breach of the standard of care because all other breaches of the standard of care that were or could have been plead[ed] were precluded by [Comer’s] voluntary dismissal of all other claims and the judgment appealed in
 
 Black I.”
 

 Dr. Black’s brief, pp. 30-31.
 

 We agree with Dr. Black that the consent claim was the only claim before the trial court on remand. As noted above, this Court in
 
 Black I
 
 explained:
 

 
 *23
 
 “[T]the consent permitted Dr. Black to perform additional operations and procedures he
 
 considered
 
 therapeutically necessary or advisable
 
 in the exercise of his professional judgment....
 
 Comer’s consent was broad and essentially ‘open-ended,’ qualified and conditioned only by the limitation that any additional operations or procedures Dr. Black might perform must be those ‘considered therapeutically necessary or advisable in the exercise of professional judgment.’ Such an authorization does not represent unlimited ‘carte blanche,’ however; it applies only to those operations and procedures that might be considered therapeutically necessary or advisable in the exercise of professional judgment. This language did not authorize Dr. Black to act in whatever fashion he might subjectively think appropriate in the exercise of his professional judgment, regardless of how medically aberrant that judgment might be.
 
 Rather, this language authorized only additional operations and procedures considered therapeutically necessary or advisable under the objective standard of care that controls the exercise of professional judgment.”
 

 920 So.2d at 1091 (emphasis added). We also stated in
 
 Black I
 
 that expert testimony was required to determine whether Dr. Black’s decision to remove the mass fell below the applicable objective standard of care:
 

 “When the trial judge entered the partial summary judgment in favor of Comer, concluding that Dr. Black did not have medically and legally efficacious consent to remove the tissue mass ultimately determined to be a kidney, it had been neither proven nor disproven that Dr. Black had exercised that level of reasonable care, skill, and diligence as another board-certified surgeon would have exercised in a like case, given all of the facts then available to Dr. Black. Whether Dr. Black failed to satisfy the ‘relative standard of care’ in that regard (§ 6-5-548(e), Ala.Code 1975) requires proof, one way or the other, by expert testimony. It could not be resolved merely on the basis of a lay understanding, which requires only common knowledge and experience. See
 
 Ex parte HealthSouth Corp.,
 
 851 So.2d 38 (Ala. 2002).”
 

 920 So.2d at 1092.
 

 At trial, Comer offered the testimony of Dr. Guy Voeller, a board-certified general surgeon, similarly situated to Dr. Black. Dr. Black’s brief to this Court summarizes Dr. Voeller’s testimony as stating that there were
 

 “only two instances in which Dr. Black deviated from the applicable standard of care. First, according to Voeller, Dr. Black should have suspended the operation which was underway at the point in time when he encountered the mass that was not identified in the radiology report of Dr. [Daniel Sherman] Foeckle.[
 
 1
 
 ] Second,
 
 if Dr. Black suspected that the mass under investigation was a lymphoma then the entire mass should not have been removed, but rather, only a small portion obtained (a biopsy) for submission to pathology.”
 

 Dr. Black’s brief, pp. 14-15 (emphasis added).
 

 Specifically, Dr. Voeller testified as follows on direct examination:
 

 “Q. Dr. Voeller, ... do you have an opinion in this case based on the materials you have reviewed about the medical
 
 *24
 
 care rendered to Mr. Comer by Dr. Black?
 

 “A. Ido.
 

 “Q. What is that opinion?
 

 “A. That it fell below the standard of care.
 

 [[Image here]]
 

 “Q. Are the circumstances under which Dr. Black cared for Lynn Comer circumstances that you are familiar with and are within your surgical specialty?
 

 “A. Yes, sir, they are.
 

 “Q. Could you tell us, generally speaking, what those circumstances were with regard to Lynn Comer?
 

 “A. Well, the patient had been having some night sweats and weight loss. I think there was a blood clot in the vein and the arm. And they really didn’t know what was going on with the patient.
 

 “There was some, I think, a history of Crohn’s disease, which is a disease of the intestine. And so the primary care physician was doing a work-up trying to figure out and trying to explain the symptoms of the patient and had ordered CAT scans and other tests and really still couldn’t explain the symptoms of the patient and referred the patient to Dr. Black for evaluation in hopes they might be able to come up with a diagnosis. And Dr. Black offered the option of what we call diagnostic laparoscopy which is where you put the little telescope into the abdominal cavity and you look around to see if you can make a diagnosis to try to explain the night sweats and weight loss and fever and whatever other symptoms Mr. Comer was having.
 

 “Q. All right. Let’s talk about Dr. Black’s basic knowledge at that point in time. You had mentioned that there was a CAT scan performed; correct, sir?
 

 “A. Yes, sir.
 

 “Q. And Dr. Black had available to him the report of that CAT scan?
 

 “A. He did.
 

 “Q. And do you recall that in part the CAT scan said that there was no retroperitoneal adenopathy seen at the time of the CAT scan?
 

 “A. Yes, sir.
 

 “Q. What does that mean?
 

 “A. Adenopathy means swollen lymph nodes and large lymph nodes. So they are just saying in the area where these lymph nodes run, there were no abnormally enlarged lymph nodes.
 

 [[Image here]]
 

 “Q. Did you see, as you said, where Dr. Black planned the diagnostic lapar-oscopy because he was worrisome for lymphoma?
 

 “A. I did see that.
 

 “Q. What is lymphoma?
 

 “A. Lymphoma is a tumor of the lymph glands. There are various kinds of lymphoma and I don’t pretend to know all the different kinds, but it’s simply a tumor in the lymph system.
 

 “Q. In terms of taking a look around as you have described, do you agree with that approach?
 

 “A. I agree with the approach as far as the diagnostic laparoscopy looking for lymphoma, I agree with the approach. I don’t know that I would have done it with a normal CAT scan, but I certainly agree with the approach.
 

 “Q. ... Did you see in the records that you have reviewed that Dr. Black dictated an operative note?
 

 “A. Yes, sir.
 

 [[Image here]]
 

 
 *25
 
 “Q. ... Do you recall in his dictation that Dr. Black said that he found something that was unexpected in the area of the distal small bowel; do you recall that?
 

 “A. I remember words — -I don’t remember the exact words, but words to something like that.
 

 [[Image here]]
 

 “Q. In his attempt to do a thorough exploration, do you understand that Dr. Black indicated that he found something that was either abnormally located or something that shouldn’t have been there?
 

 “A. Yes, sir.
 

 “Q. Why do you say that?
 

 “A. Well, he described this mass that we have been talking about that the CAT scan certainly didn’t describe, so he wasn’t prepared to see what he saw through the laparoscope because he had a CAT scan not mentioning that.
 

 “Q. At that precise moment, at the moment that he realizes that he sees something that is not mentioned on the report of the CAT scan, what does the standard of care require of the general surgeon like Dr. Black in 1995 to do at that moment?
 

 “A. To go get the CAT scan and preferably get with the radiologist to go over the CAT scan at that time in the operating room or in radiology.
 

 [[Image here]]
 

 “Q. In fairness to Dr. Black, the report by the radiologist does not mention the ectopic location of the left kidney, does it?
 

 “A. It does not.
 

 [[Image here]]
 

 “Q. Would the standard of care existing at the time in 1995 require Dr. Black, if unsure about his own interpretation of the CAT scan, to get with or consult with the radiologist about his interpretation of the CAT scan?
 

 “A. Yes, sir, and because we have the discrepancy. I mean we have a CAT scan that’s normal supposedly and we put our telescope in and we see something that has not been on the report, on the CAT scan report, and you have to try to figure out what’s going on. So you have to go get the films, you have to look at it and try to put the puzzle together.
 

 [[Image here]]
 

 “Q. ... [Biased on everything you have seen, everything you know from the chart, did Dr. Black know what he was reviewing at the time that he cut the mass out?
 

 [[Image here]]
 

 “A. I can promise you if he knew what he was doing, he wouldn’t have removed it.
 

 “Q. Why is that the case?
 

 “A. Several reasons. Again, we get back to the situation that we have a normal CAT scan report. We put our telescope in and we see this big thing there that’s not on the report, so that’s the first thing. All right. So
 
 let’s pretend that we don’t have the CAT scan report, hypothetical or whatever you want to call it, and you are thinking it’s lymphoma, which is what Dr. Black was thinking, you know, we are having these symptoms, could it be lymphoma.
 
 Again, the CAT scan doesn’t even talk about lymph nodes and if I had a normal CAT scan I wouldn’t even put a laparo-scope in. Say you put the laparoscope in and you are looking for lymph nodes and you see this big mass there, well,
 
 if you think it’s lymphoma, you biopsy it, you put a needle in there, you take a piece of it; and then the treatment of that is not removal, you don’t remove
 
 
 *26
 

 this.
 
 So even if it was lymphoma,
 
 this patient didn’t need this thing removed.
 
 The patient needed a diagnosis if we thought it was lymphoma; that’s what they needed — but the treatment of lymphoma is chemotherapy and radiation therapy based on the types of lymphoma.
 
 Removal of this mass, even if it was lymphoma, was not necessary.”
 

 On cross-examination, Dr. Voeller testified:
 

 “Q. ... Is your opinion ... [t]hat at the time he saw what he thought was a mass, it is at that point that he should have stopped the surgery and gone up and looked at the film?
 

 “A. Yes, sir; or had the film brought to him.
 

 “Q. Or had the film brought to him; correct?
 

 “A. Yes, sir.
 

 “Q. And that is your only opinion that he deviated from the standard of care; am I correct about that?
 

 “A. Well, I think also what I mentioned earlier that let’s give him the benefit of the doubt and say okay, I think it’s a lymphoma; even that, if he thinks it’s a lymphoma, you don’t open the patient and remove a lymphoma.
 

 “Q. I want to ask you about that in a minute.
 

 “A. So I think that will be a deviation, also.
 

 “Q. So two deviations then; correct?
 

 “A. Yes, sir.
 

 “Q. One, should have gone up and looked at the film when he saw the mass?
 

 “A. And that would not — had he done that, nothing else would have occurred.
 
 But let’s give him this misinterpretation or the not complete report by the radiologist and he still thinks he is dealing with a lymphoma, which isn’t the case, then you don’t proceed to open the patient up and remove
 
 it.[
 
 2
 
 ]
 

 “Q. All right.
 
 So even if it was a lymphoma, you say he deviated from the standard of care in removing it?
 

 “A.
 
 Yes, sir.”
 

 Dr. Black argues to this Court that Comer “offered no expert testimony that Dr. Black breached the standard of care in determining, in his professional judgment, that removal of the mass was therapeutically necessary or advisable, or even more general testimony that Dr. Black breached the standard of care by exceeding the scope of the consent.” Dr. Black’s brief, pp. 31-32. We disagree.
 

 Although Dr. Black presented expert testimony that indicated his decision to remove the mass was appropriate, Dr. Voeller testified clearly that Dr. Black’s decision to remove the mass deviated from the applicable objective standard of care. Thus, Comer presented substantial evidence indicating that Dr. Black’s decision to remove the mass was not, in the language of the written consent, an “additional operation! ] [or] procedure! ]” that was “considered therapeutically necessary or advisable in the exercise of professional judgment.” In other words, by demonstrating that Dr. Black’s decision to remove the mass deviated from the standard of care, Comer presented substantial evidence indicating that the removal of the mass was not “therapeutically necessary or advisable in the exercise of professional judgment” and that Dr. Black therefore
 
 *27
 
 exceeded the scope of the written consent. Accordingly, Dr. Black was not entitled to a JML on the consent claim.
 

 Dr. Black next contends that “[t]he evidence [was] insufficient to warrant compensatory damages in the amount of $350,000, and a remittitur is required.” Dr. Black’s brief, p. 32. In
 
 Daniels v. East Alabama Paving, Inc.,
 
 740 So.2d 1033, 1044 (Ala.1999), this Court stated the following regarding our review for exces-siveness of an award of compensatory damages for mental anguish:
 

 “We recently, in
 
 Kmart Carp. v. Kyles,
 
 723 So.2d 572 (Ala.1998), modified the review procedure established in
 
 Hammond [v. City of Gadsden,
 
 493 So.2d 1374 (Ala.1986) ], to add an additional basis upon which a jury verdict may be flawed. We held in
 
 Kmart
 
 that damages awarded for mental anguish were subject to strict scrutiny if the plaintiff had not suffered any physical injury and offered little or no direct evidence concerning the degree of mental suffering he or she had experienced. That principle established in
 
 Kmart
 
 does not apply in this case, because the Danielses each suffered physical injuries and experienced varying degrees of pain and suffering. Moreover, each plaintiff presented extensive direct evidence regarding the degree of mental anguish he or she had experienced, either through his or her own testimony or through the testimony of physicians and others who had knowledge of their suffering and anguish.
 

 “Under normal circumstances, when a court determines that a particular verdict is excessive, the court necessarily concludes that the verdict resulted from some bias, prejudice, passion, corruption, or improper motive on the part of the jury. The court is then faced with ordering a remittitur, and the question becomes ‘How much?’ There is no yardstick for measuring the proper reduction. In this situation, the court often turns to a comparison of jury verdicts in similar cases for some guidance.
 

 “In the absence of a flawed verdict, however, a comparison of jury verdicts in similar cases is not the standard for determining whether a jury verdict should be reduced. The trial court must first determine that the verdict was flawed. As this Court stated in
 
 Pitt v. Century II, Inc.,
 
 [631 So.2d 235, 239 (Ala.1993) ], ‘a review of a jury verdict for compensatory damages on the ground of excessiveness must focus on the plaintiff (as victim) and ask what the evidence supports in terms of damages suffered by the plaintiff.’ In the absence of a flawed verdict, ‘there is no statutory authority to invade the province of the jury in awarding compensatory damages.’
 
 Id.
 
 at 240.
 

 “This Court has long held that ‘[t]here is no fixed standard for ascertainment of compensatory damages recoverable ... for physical pain and mental suffering’ and that ‘the amount of such [an] award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise of that discretion.’
 
 Alabama Power Co. v. Mosley,
 
 294 Ala. 394, 401, 318 So.2d 260, 266 (1975). This Court has consistently held that a trial court cannot interfere with a jury verdict merely because it believes the jury gave too little or too much.
 
 Williston v. Ard,
 
 611 So.2d 274 (Ala.1992);
 
 Olympia Spa v. Johnson,
 
 547 So.2d 80 (Ala.1989); and
 
 Vest v. Gay,
 
 275 Ala. 286, 154 So.2d 297 (Ala. 1963).”
 

 In this case, there is evidence of both physical injury and mental anguish. Thus, in reviewing the compensatory-damages award in the present case, we do not apply the heightened scrutiny set forth in
 
 Kmart Corp. v. Kyles,
 
 723 So.2d 572 (Ala.1998), as discussed in
 
 Daniels, supra.
 
 Rather, we
 
 *28
 
 review the award in this case to determine only whether in determining the amount of damages the jury clearly abused its discretion.
 
 Daniels,
 
 740 So.2d at 1044.
 
 See also Delchamps, Inc. v. Bryant,
 
 738 So.2d 824, 837 (Ala.1999) (“There is no fixed standard for determining the amount of compensatory damages a jury may award for mental anguish. The amount of the damages award is left to the jury’s sound discretion, subject to review by the court for a clear abuse of that discretion.”).
 

 Comer’s physical injuries include the permanent loss of his kidney. He presented evidence of his pain and suffering and the mental anguish caused by Dr. Black’s removal of his kidney. After the removal of his kidney, Comer suffered internal bleeding from two arteries in the area where his kidney had been removed. Comer testified that, before the emergency surgery to stop the bleeding, he suffered “incredible pain” and had trouble breathing and he thought “that [he] was gone, [that he] was going to die.” He also incurred medical expenses of $10,465.65.
 

 Dr. Comer cites several cases in support of his argument that the compensatory-damages award was excessive. Those cases are inapposite, however, because none of them involved the review of a compensatory-damages award for mental anguish in which the plaintiff also suffered a physical injury.
 

 Under the circumstances of this case, the compensatory-damages award was not excessive.
 

 Conclusion
 

 The judgment is affirmed.
 

 AFFIRMED.
 

 COBB, C.J., and WOODALL, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 '^1Although Comer stated in the motion that he sought a summary judgment ‘as to liability on his claims for failure of
 
 informed
 
 consent and battery' (emphasis supplied) and although Dr. Black’s opposition to the motion addressed, in pertinent part, the cause of action arising out of performing a medical procedure without obtaining
 
 informed
 
 consent from the patient, the parties subsequently converted the claim to one asserting simply a lack of consent. Specifically, Comer filed a response to Dr. Black’s opposition in which Comer explained that after he had filed his motion, this Court issued its opinion in
 
 Cain v. Howorth,
 
 877 So.2d 566 (Ala.2003), distinguishing between a claim of a lack of consent to the performance of a medical procedure and a claim of a ‘lack of informed consent.' Comer advised that the claim he had pleaded as ‘negligence in failing to obtain consent’ should now be understood as one 'allegfing] failure to obtain consent (rather than informed consent).' Dr. Black accepted that recasting of the claim, characterizing the claim in his subsequent submission to the trial court as one of ‘lack of consent,’ and he does likewise throughout his briefs to this Court. Accordingly, we address only a claim of lack of consent, as opposed to a claim of lack of informed consent.”
 

 [1]
 

 . Dr. Foeckle was originally named as a defendant in Comer's complaint; on Comer’s motion, the trial court dismissed Dr. Foeclde as a defendant on February 11, 2003.
 

 [2]
 

 . In his materials to this Court, Dr. Black places great emphasis on Comer’s voluntary dismissal of allegations in his complaint that Dr. Black’s failure to review the CAT scans fell below the standard of care. However, Dr. Voeller’s testimony was that, even if there had been no CAT scan, Dr. Black’s decision to remove the mass still deviated from the applicable standard of care.